1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GEERTSON SEED FARMS, et al.,

       Plaintiffs,

  v.

MIKE JOHANNS, Secretary of the United
States Department of Agriculture, et al.,

       Defendants.

_____/

No. C 06-01075 CRB

**MEMORANDUM AND ORDER**

      In this lawsuit plaintiff alfalfa growers along with the Sierra Club and other farmer and consumer associations challenge the Department of Agriculture's decision to deregulate alfalfa genetically engineered to resist the herbicide glyphosate, the active ingredient in RoundUp ("Roundup Ready alfalfa"). Plaintiffs bring their claims pursuant to the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Plant Protection Act ("PPA"). Now pending before the Court are the parties' cross-motions for summary judgment. The motions raise a close question of first impression: whether the introduction of a genetically engineered crop that might significantly decrease the availability or even eliminate all non-genetically engineered varieties is a "significant environmental impact" requiring the preparation of an environmental impact statement, at least when it involves the fourth largest crop in the United States.

**BACKGROUND**

The federal Plant Protection Act gives the Secretary of the United States Department of Agriculture ("USDA") the authority to adopt regulations preventing the introduction and dissemination of plant pests. 7 U.S.C. § 7711(a); Center for Food Safety v. Johanns, 451 F.Supp.2d 1165, 1176 (D. Haw. 2006). Pursuant to this authority, the USDA, through the Animal and Plant Health Inspection Service ("APHIS"), regulates "organisms and products altered or produced through genetic engineering that are plant pests or are believed to be plant pests." 7 C.F.R. § 340.0(a)(2) n.1. Such products/organisms are known as "regulated articles." APHIS originally considered Roundup Ready alfalfa a regulated article; as such, it was unlawful for any person to introduce the alfalfa without first obtaining permission from APHIS. Id.

Any person may submit a petition seeking a determination that a regulated article does not present a plant pest risk and therefore should not be regulated. 7 C.F.R. § 340.6. In May 2003, Monsanto, the manufacturer of Roundup, submitted a petition requesting nonregulated status for Roundup Ready alfalfa, designated as event J101 and J163. Administrative Record ("AR") 5482. Roundup Ready alfalfa is engineered to be glyphosate-tolerant by inserting a gene that codes for the enzyme 5-enolpyruvylshikimate-3-phosphate synthase into the alfalfa genome. AR 5501.

APHIS had several possible responses: it could approve the petition in whole, approve the petition in part, or deny the petition. AR 5503. If it denied the petition, commercial-scale production of Roundup Ready alfalfa would continue to be precluded, although the plant could still be grown in field trials, as it has since 1998. AR 5503. APHIS could also determine that Roundup Ready alfalfa poses no significant risk in certain geographic areas, but a significant risk in others, and therefore approve the petition in part; that is, approve the petition with a geographic limitation on where the genetically engineered alfalfa could be grown. AR 5504. Finally, APHIS could approve the petition in whole, which means that Roundup Ready alfalfa would no longer be subject to USDA regulation. AR 5505.

**United States District Court**
For the Northern District of California

1    Before deciding Monsanto's petition, APHIS prepared an Environmental Assessment

2  ("EA") and took public comments on the EA and the petition for deregulation.  Of the 663

3  comments received by the agency, 520 opposed deregulation.  AR 5487.

4     One of the primary objections raised is that gene transmission may occur between

5  glyphosate tolerant alfalfa and conventional and organic alfalfa, that is, that conventional and

6  organic alfalfa will become "contaminated" with the engineered gene that makes Roundup

7  Ready alfalfa tolerant to glyphosate.  Such gene transmission is possible because alfalfa is

8  pollinated by bees "and so the potential exists to move pollen from the glyphosate tolerant

9  crop to hay and seed fields, as well as wild populations of alfalfa." AR 5488.  Indeed, it is

10 undisputed that insect pollination for alfalfa can occur up to at least two miles from the

11 pollen source.  Id.  Farmers complained to APHIS that if Roundup Ready alfalfa is

12 deregulated they will no longer be able to market their products as "organic," or at least as

13 non-genetically engineered, and that this "contamination" will also impact those who sell

14 organic livestock or livestock that is not fed any genetically engineered foods.  AR 5488,

15 5491, 5495.  In addition, 75 percent of the alfalfa exported from the United States (five

16 percent of the alfalfa market) is exported to Japan and Japan does not permit the import of

17 glyphosate tolerant alfalfa; thus, the introduction of Roundup Ready alfalfa might also

18 impact the export market.  AR 5487.

19    Commentators also expressed concern that the deregulation of Roundup Ready alfalfa,

20 and the concomittant increase in the use of Roundup, will cause the development of

21 additional glyphosate-resistant weeds, as well as a dramatic increase in the amount of

22 Roundup used in the environment.

23    Nonetheless, in June 2005, APHIS issued a Finding of No Significant Impact

24 ("FONSI") and approved Monsanto's deregulation petition in whole; that is, the agency

25 concluded that Roundup Ready alfalfa should be deregulated and sold without direct

26 regulation by the USDA.  AR 5485-5526.

27    The FONSI acknowledges that once Roundup Ready alfalfa is deregulated, it will not

28 be subject to any "isolation distances;" that is, it will not be required to be grown more than

United States District Court
For the Northern District of California

two miles from conventional or organic alfalfa crops.  AR 5488;  see also AR 5495 ("If APHIS grants non-regulated status to a transgenic events, APHIS does not have any further regulatory authority over this particular transgenic event").   APHIS nevertheless concluded that the risk of gene transmission is not significant because "organic production operations must develop and maintain an organic production system plan that outlines the steps it will take to avoid cross pollination from neighboring operations."  AR 5488.  In other words, it would be "up to the individual organic seed or hay grower to institute those procedures that will assure" that their crops will not include any genetically engineered alfalfa.  AR 5491. APHIS also noted that the states would still have the authority to establish some type of production zone.  AR 5495.  As for exports to Japan, APHIS concluded, without elaboration, that "[b]y employing reasonable quality control, it is highly unlikely that the level of glyphosate tolerant alfalfa will exceed 1% in conventional alfalfa hay" and that since Japan allows one percent of exports of a crop to contain genetically modified product, exports to Japan would not be affected.  AR 5488.

In the EA, APHIS concluded that organic farmers and farmers who otherwise do not want to grow genetically engineered alfalfa will not be significantly impacted by the commercial use of Roundup Ready alfalfa because (1) non-genetically engineered alfalfa will "likely still be sold and available to those who wish to plant it;" and (2) farmers purchasing seed will know what they are purchasing because the seed will be labeled as glyphosate tolerant.  AR 5511.

APHIS agreed with the objectors that the deregulation of Roundup Ready alfalfa could lead to the development of additional glyphosate-resistant weeds, but reasoned that this impact was not significant because weed species have developed resistance to every widely used herbicide; alternative herbicides are available to minimize the problem; and, in any event, "good stewardship may be the only defense against this potential problem."  AR 5492.

Plaintiffs now challenge APHIS's decision to deregulate Roundup Ready alfalfa.

**DISCUSSION**

**I.     NEPA**

NEPA "requires a federal agency such as [APHIS] to prepare a detailed EIS for all 'major Federal actions significantly affecting the quality of the human environment.'" Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211-12 (9th Cir. 1998) (quoting 42 U.S.C. § 4332(2)(C)).  "NEPA ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience."  Id. (internal quotation marks and citation omitted).

Accordingly, "[a] threshold question in a NEPA case is whether a proposed project will 'significantly affect' the environment, thereby triggering the requirement for an EIS." Id.  "Where an EIS is not categorically required, the agency must prepare an Environmental Assessment to determine whether the environmental impact is significant enough to warrant an EIS."  Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 863 (9th Cir. 2005).  "An EA is a concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." Blue Mountains Biodiversity Project, 161 F.3d at 1212.

Here, APHIS prepared an EA and, after receiving public comment, issued a finding of no significant impact and approved the deregulation of Roundup Ready alfalfa.  See Anderson v. Evans, 371 F.3d 475, 488 (9th Cir. 2004) (if an EA results in a "finding of no significant impact"--known as a FONSI--the agency need not prepare an environmental impact statement).  Plaintiffs contend that APHIS is required to prepare an EIS.

**A.     Standard of Review**

The Court must determine whether APHIS's "decision was based on consideration of the relevant factors, or whether its actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  Blue Mountains Biodiversity Project, 161 F.3d at 1211 (internal quotation marks and citation omitted).  "In short, [the Court] must ensure that the agency has taken a 'hard look' at the environmental consequences of its proposed

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

action." Id. "A hard look includes considering all foreseeable direct and indirect impacts.'"

Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1159 (9th Cir. 2006) (internal

quotation marks and citation omitted). "An agency's decision not to prepare an EIS will be

considered unreasonable if the agency fails to supply a convincing statement of reasons why

potential effects are insignificant." Blue Mountains Biodiversity Project, 161 F.3d at 1211

(internal quotation marks and citation omitted); see also Ocean Advocates, 402 F.3d at 865

("[T]he agency must put forth a 'convincing statement' of reasons that explain why the

[agency action] will impact the environment no more than insignificantly"). "The statement

of reasons is crucial to determining whether the agency took a 'hard look' at the potential

environmental impact of a project." Blue Mountains Biodiversity Project, 161 F.3d at 1212

(internal quotation marks and citation omitted).

### B.    Analysis

"[A]n EIS *must* be prepared if 'substantial questions are raised as to whether a project

*may* cause significant degradation of some human environmental factor.'" Idaho Sporting

Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting Greenpeace Action v.

Franklin, 14 F.3d 1324, 1332 (9th Cir. 1992)). "Thus to prevail on a claim that [APHIS]

violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects

will in fact occur. It is enough for the plaintiff to raise substantial questions whether a

project may have a significant effect on the environment." Blue Mountains Biodiversity

Project, 161 F.3d at 1212 (internal quotation marks and citation omitted). "Put another way,

a proposal can be considered controversial if substantial questions are raised as to whether a

project may cause significant degradation of some human environmental factor." Anderson,

371 F.3d at 489.

"In determining whether a federal action requires an EIS because it significantly

affects the quality of the human environment, an agency must consider what 'significantly'

means." Ocean Advocates, 402 F.3d at 865. "Significantly," has two components: context

and intensity. Id. (citing 40 C.F.R. § 1508.27). "Context refers to the setting in which the

proposed action take place." Id. (citing 40 C.F.R. § 1508.27(a)). "Intensity means 'the

1 severity of the impact.'" Id. (citing 40 C.F.R. § 1508.27(b)).

2   Several factors must be considered in evaluating intensity, including the "degree to

3 which the effects on the quality of the human environment are likely to be highly

4 controversial;" "[t]he degree to which the possible effects on the human environment are

5 highly uncertain or involve unique or unknown risks;" and "[t]he degree to which the

6 proposed action affects public health and safety." 40 C.F.R. § 1508.27(b)(2), (4), (6).

7   The context of the inquiry in this case is undisputed.  Alfalfa is the fourth most widely

8 grown crop in the United States.  The bulk of alfalfa seed (as opposed to alfalfa forage) is

9 grown in limited geographic areas within a few states.  California is the largest producer of

10 alfalfa seed, and California, Idaho, Washington and Nevada together produce 85 percent of

11 all domestic alfalfa seed.  In this context, plaintiffs identify what they believe are several

12 significant environmental impacts that will be caused by Roundup Ready alfalfa, or that at

13 least may be caused by the deregulation of the genetically engineered alfalfa.

14   **1.   Gene transmission to non-genetically engineered alfalfa**

15   Plaintiffs contend that one significant environmental impact resulting from the

16 introduction of Roundup Ready alfalfa is that genetically engineered alfalfa will modify non-

17 genetically engineered alfalfa such that it, too, will contain the gene that confers tolerance to

18 the herbicide glyphosate.  Plaintiffs label such effect "biological contamination."  Biological

19 contamination can occur through pollination of non-genetically engineered plants by

20 genetically engineered plants or by the mixing of genetically engineered seed with natural, or

21 non-genetically engineered seed.

22   Alfalfa seeds are pollinated by bees and, as a result, there is a realistic potential for

23 contamination from seed fields to nearby seed fields; indeed, APHIS admits that insects

24 pollinate alfalfa up to two miles from the pollen source.  AR 5488.  Such gene transmission

25 is especially likely in this context given the geographic concentration of alfalfa seed

26 production.  Once the gene transmission occurs and a farmer's seed crop is contaminated

27 with the Roundup Ready gene, there is no way for the farmer to remove the gene from the

28

crop or control its further spread.  AR 4287.  And alfalfa is a perennial crop; the crop is only replanted every three to four years.

Plaintiffs complain that the "contamination" of organic and conventional crops with the genetically engineered gene will have negative economic and socioeconomic effects on farmers.  Organic farmers will no longer be able to market their seed as non-genetically engineered, rendering their crops less valuable; consumers pay a premium for organic and non-genetically engineered food.  Similarly, organic livestock farmers will have a more difficult time purchasing non-genetically engineered alfalfa as food for livestock and thus will be unable to market their livestock as organic or at least fed with non-genetically engineered food.  All of these farmers may be required to test their crops and livestock for traces of the genetically-engineered alfalfa.  Even non-organic farmers who want to raise genetically-engineered free plants and livestock will be impacted.

APHIS acknowledges that once Roundup Ready alfalfa is deregulated the government will not be able to impose isolation distances on the growers of genetically engineered alfalfa; in other words, it cannot ensure that farmers using the genetically engineered seed will be more than two miles away from seed farmers who do not wish to grow engineered alfalfa.  AR 5488.  APHIS nonetheless concluded that the introduction of Roundup Ready alfalfa will have no significant environmental impact, reasoning as follows:

> [T]he National Organic Program, which is administered by USDA's Agricultural Marketing Service, requires organic production operations to have distinct, defined boundaries and buffer zones to prevent unintended contact with prohibited substances, such as modified genes, from adjoining land that is not under organic management.  However, the determination of the size of the buffer zones is left up to the organic producer and the certifying agent on a case-by-case basis.  Furthermore, organic production operations must develop and maintain an organic production system plan that outlines the steps it will take to avoid cross pollination from neighboring operations.

AR 5488, 5510.  It also reasoned that federal organic standards do not require the testing of inputs or products for genetically engineered genes and that the unintentional presence of the engineered genes will not "necessarily" constitute a violation of national organic standards.  AR 5511.

1    In the EA, APHIS concluded, without further elaboration, that non-genetically

2 engineered alfalfa seed "will likely still be sold and will be available to those who wish to

3 plant it," and that genetically engineered seed will be marketed and labeled as glyphosate

4 tolerant so farmers will know when they are purchasing Roundup Ready alfalfa seed.  AR

5 5511.  APHIS also found that gene transmission is not likely to occur with forage as opposed

6 to seed crops because forage fields are typically harvested before the seed is set and allowed

7 to mature.  Id.

8    APHIS's reasons for concluding that the potential for the transmission of the

9 genetically engineered gene is not significant are not "convincing" and do not demonstrate

10 the "hard look" that NEPA requires.  See Blue Mountains Biodiversity Project, 161 F.3d at

11 1211.  APHIS did not conclude that gene transmission would not occur; indeed, an internal

12 APHIS email acknowledges that "[i]t may be hard to guarantee that seeds or sprouts are GE

13 free."  AR 2816.  Instead, it in effect concluded that whatever the likelihood of gene

14 transmission, such impact is not significant because it is the organic and conventional

15 farmers' responsibility to ensure that such contamination does not occur.  It rested its "no

16 significant impact" decision on this conclusion even though it made no inquiry into whether

17 those farmers who do not want to grow genetically engineered alfalfa can, in fact, protect

18 their crops from contamination, especially given the high geographic concentration of seed

19 farms and the fact that alfalfa is pollinated by bees that can travel more than two miles.

20 Neither the EA nor the FONSI identify a single method that an organic farmer can employ to

21 protect his crop from being pollinated by a bee that travels from a nearby genetically

22 engineered seed farm, even assuming the farmer maintains a "buffer zone."

23    "Preparation of an EIS is mandatory where uncertainty may be resolved by further

24 collection of data, or where the collection of data may prevent speculation on potential . . .

25 effects.  The purpose of an EIS is to obviate the need for speculation by insuring that

26 available data are gathered and implemented prior to the proposed action."  National Parks

27 Conservation Ass'n v. Babbitt, 241 F.3d 722, 732 (9th Cir. 2001) (internal quotation marks

28 and citation omitted).  The further collection of data can inform APHIS as to the likely extent

United States District Court
For the Northern District of California

1   of any gene transmission and the realistic measures, if any, that may be taken to prevent or at

2   least reduce such contamination.  Such data is especially important given that one option

3   APHIS has is to approve Monsanto's "petition with a geographic limitation stipulating that

4   the Roundup Ready could only be grown without APHIS authorization in certain geographic

5   areas."  AR 5504.  APHIS's rejection of this option without making any inquiry into the

6   extent of likely gene transmission from genetically engineered seed crops to non-engineered

7   seed crops is arbitrary and capricious; it did not obtain the very information it needs to

8   determine if such an option is warranted.  See Earth Island Institute, 442 F.3d at 1160 ("If an

9   agency has failed to make a reasoned decision based on an evaluation of the evidence, [a

10  court] may properly conclude that the agency has acted arbitrarily and capriciously.");

11  Foundation for N. Am. Wild Sheep v. U.S. Dep't of Agr., 681 F.2d 1172, 1178 (9th Cir.

12  1982) (holding that agency violated NEPA when its EA "failed to address certain crucial

13  factors, consideration of which was essential to a truly informed decision whether or not to

14  prepare an EIS").

15          APHIS's conclusion that forage alfalfa will not be contaminated is also arbitrary and

16  capricious.  APHIS baldly concluded that such gene transmission is not likely because

17  farmers typically harvest alfalfa forage fields before the seed matures.  APHIS failed to

18  consider, however, that because of weather--which is beyond a farmer's control--a farmer

19  cannot always harvest his field at the most optimal time.  APHIS made no inquiry into how

20  often farmers are actually able to harvest their forage crop before seeds mature and no

21  inquiry into the likelihood of gene transmission when they cannot.  Without such data,

22  APHIS's conclusion is arbitrary.  See Earth Island Institute, 442 F.3d at 1159 ("A hard look

23  should involve a discussion of adverse impacts that does not improperly minimize negative

24  side effects").

25          APHIS's reasoning that farmers will not "necessarily" be prohibited from labeling

26  their products as organic is wholly inadequate.  First, the statement itself is equivocal; even

27  APHIS is uncertain whether farmers can still label their products organic under the federal

28  government's organic standards.  Second, many farmers and consumers have higher

United States District Court
For the Northern District of California

1    standards than what the federal government currently permits; to these farmers and

2    consumers organic means not genetically engineered, even if the farmer did not intend for his

3    crop to be so engineered.  And, as APHIS acknowledges, many countries, including Japan,

4    do not allow for the importation of genetically engineered alfalfa regardless of what the

5    United States government permits.  Third, and most importantly, APHIS's comment simply

6    ignores that these farmers do not want to grow or feed to their livestock genetically

7    engineered alfalfa, regardless of how such alfalfa can be marketed.

8            APHIS's assertion that exports to Japan will not be harmed because Japan allows one

9    percent of its imported alfalfa to be transgenic and "[b]y employing reasonable quality

10   control, it is highly unlikely that the level of glyphosate tolerant alfalfa will exceed 1% in

11   conventional alfalfa hay," AR 5488, is also not convincing.  Neither the EA nor the FONSI

12   contain any reference to any material in support of APHIS's conclusion that gene

13   transmission is "highly unlikely" to occur with "reasonable quality control."  APHIS does

14   not identify any "quality control" that will prevent gene transmission between neighboring

15   seed farms.  It similarly does not identify any material to support its EA statement that non-

16   genetically engineered alfalfa will "likely still be sold and available to those who wish to

17   plant it."  AR 5511.  See Blue Mountains Biodiversity Project, 1161 F.3d at 1214 ("The EA

18   contains virtually no reference to any material in support of or in opposition to its

19   conclusions.  That is where the Forest Service's defense of its position must be found").

20           APHIS argues in its brief that the extent of any gene transmission is, in any event,

21   irrelevant because NEPA requires an agency to consider physical environmental impacts, not

22   economic or financial impacts.  APHIS overstates the law.  To determine whether NEPA

23   requires an agency to consider a particular effect, courts must "look at the relationship

24   between that effect and the change in the physical environment caused by the major federal

25   action at issue."  Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766,

26   773 (1983);  see also San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,

27   449 F.3d 1016, 1029 (9th Cir. 2006) ("[T]he essential analysis must focus on the closeness of

28   the relationship between the change in the environment and the 'effect' at issue") (internal

United States District Court
For the Northern District of California

quotation marks and citation omitted); <u>Ashley Creek Phosphate Co. v. Norton</u>, 420 F.3d 934, 943 (9th Cir. 2005) ("NEPA does not require an agency to assess all impacts of a project, only those that have a 'reasonably close causal relationship' with 'a change in the physical environment"). Economic effects are relevant "when they are '*interrelated'* with 'natural or physical environmental effects.'" <u>Ashley Creek Phosphate Co.</u>, 420 F.3d at 944 (quoting 40 C.F.R. § 1508.14 ("[E]conomic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment")).

Here, the economic effects on the organic and conventional farmers of the government's deregulation decision are interrelated with, and, indeed, a direct result of, the effect on the physical environment; namely, the alteration of a plant specie's DNA through the transmission of the genetically engineered gene to organic and conventional alfalfa. APHIS was required to consider those effects in assessing whether the impact of its proposed action is "significant." And, in fact, APHIS did mention those effects in the FONSI and EA, but, as explained above, its reasons for concluding that the effect on organic and conventional farmers is not significant are not "convincing."

Finally, the government argues that even if the deregulation of Roundup Ready alfalfa could result in the elimination of all non-genetically engineered alfalfa--in other words, there would be no alfalfa grown in the United States that does not contain the engineered gene that confers tolerance to glyphosate--such a result would still not constitute a significant environmental impact because APHIS has determined that the introduction of that gene to alfalfa is harmless to humans and livestock, that is, it is not toxic or pathogenic. Draft Transcript of January 19, 2007 Hearing at 54-55. APHIS's position is based on its finding that the engineered gene is similar to another gene already present in non-engineered alfalfa and is the equivalent to a natural enzyme found in both green plants and microorganims that are common in nature. AR 5482, 5483, 5490-91, 5501-5502, 5491. In sum, APHIS

**United States District Court**
For the Northern District of California

1  concluded that the engineered enzyme is equivalent in all biological respects to those that are

2  common and harmless in nature and therefore the introduction of that engineered gene into

3  conventional or organic alfalfa is not a significant environmental impact as a matter of law.

4      The Court accepts, as it must, the agency's determination that Roundup Ready alfalfa

5  does not have any harmful health effects on humans or livestock.  See Natural Res. Defense

6  Council, Inc. v. EPA, 863 F.2d 1420, 1430 (9th Cir. 1988) ("A reviewing court should be at

7  its most deferential in reviewing an agency's scientific determinations in an area within the

8  agency's expertise").  Public health and safety, however, is only *one* of factors  that an

9  agency should consider when determining whether a major federal action may have a

10  significant environmental impact.  40 C.F.R. § 1508.27(b).  The government does not cite

11  any case, and the Court is aware of none, which holds that an impact is not significant simply

12  because a federal agency determines that the major federal action does not jeopardize the

13  public's health and safety.  The paucity of caselaw is unsurprising given that one of

14  Congress's express goals in adopting NEPA was to "attain the widest range of beneficial

15  uses of the environment without degradation, risk to health and safety, *or other undesirable*

16  *and unintended consequences.*"  42 U.S.C. § 4331(b)(3) (emphasis added).  A federal action

17  that eliminates a farmer's choice to grow non-genetically engineered crops, or a consumer's

18  choice to eat non-genetically engineered food, is an undesirable consequence: another NEPA

19  goal is to "maintain, wherever possible, an environment which supports diversity and variety

20  of individual choice."  42 U.S.C. § 4331(b)(4).

21      To put it another way, if the government's action could eliminate all alfalfa, there

22  would be no dispute that such action has a significant environmental impact, even though the

23  primary impact is the economic effect on alfalfa and livestock farmers.  For those farmers

24  who choose to grow non-genetically engineered alfalfa, the possibility that their crops will be

25  infected with the engineered gene is tantamount to the elimination of all alfalfa; they cannot

26  grow their chosen crop.  The government's apparent belief that the farmers' and consumers'

27  choice is irrational because the engineered gene is similar in all biological respects to a gene

28  found in nature (although never in alfalfa) is beside the point.  An action which potentially

13

United States District Court
For the Northern District of California

eliminates or least greatly reduces the availability of a particular plant--here, non-engineered alfalfa--has a significant effect on the human environment.  See 40 C.F.R. § 1508.27(b) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial").

One other point bears mention.  At oral argument the Court asked the government why APHIS addressed (albeit inadequately) the economic impact on farmers if it is the agency's position that, regardless of how much gene transmission occurs, such transmission is insignificant because it is harmless.  The government candidly explained that it addressed these possible effects because Roundup Ready alfalfa is the first crop that has been engineered to resist a herbicide "and in which the record suggests that there's at least a chance that the [genetically engineered] gene could be transmitted."  Draft Transcript of January 19, 2007 Hearing at 53.  The government's response highlights that APHIS is operating in uncharted territory.  In light of the Court's conclusion that the permanent modification of a plant's genetic makeup through genetic engineering is an effect on the human environment, and the evidence that such transmission can and will occur, and that APHIS did not adequately analyze the extent of such transmission, the possible effects of APHIS's deregulation decision are "highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(5).

The Court cautions that it is not ruling that Roundup Ready alfalfa is harmful to consumers or livestock.  Rather, the significant impact that requires the preparation of an EIS is the possibility that the deregulation of Roundup Ready alfalfa will degrade the human environment by eliminating a farmer's choice to grow non-genetically engineered alfalfa and a consumer's choice to consume such food.

### 2.       The development of alfalfa weeds resistant to herbicides

Plaintiffs also complain that the deregulation of Roundup Ready alfalfa will cause Roundup-resistant weeds, and that such an effect is sufficiently significant to require the preparation of an EIS.  APHIS acknowledges that the use of Roundup Ready alfalfa may result in the development of Roundup-tolerant weeds.  AR 5492.  The resistance develops

14

because of the increased use of Roundup on the crops.  APHIS found that such a possible impact nevertheless does not warrant the preparation of an EIS because weed species often develop resistance to herbicides and the agricultural community is addressing the issue. "Alternative herbicides and strategies are available that may minimize the problem.  Based on the comments, the alfalfa growers and weed scientists understand that good stewardship may be the only defense against this potential problem."  AR 5492

APHIS's reasons for finding the development of glyphosate resistant weeds not to be significant are not convincing.  Reasoning that weed species often develop resistance to herbicides is tantamount to concluding that because this environmental impact has occurred in other contexts it cannot be significant.  Nothing in NEPA, the relevant regulations, or the caselaw support such a cavalier response.

The assertion that "good stewardship" may be the only defense against such weeds is equally unconvincing.  Such a conclusion is not the same as a finding that the development of the weeds is not a significant environmental impact.  This is especially so given that neither the FONSI nor the EA contain any analysis as to what exactly constitutes good stewardship and how likely it is to be practiced successfully.  See Blue Mountains Biodiversity Project, 161 F.3d at 1214.  There may be ways to reduce the proliferation of weeds, but if farmers are not engaging (or cannot engage) in those practices, then the availability of those practices does not ameliorate the potential environmental impact.

Finally, APHIS failed to evaluate the cumulative impact of the deregulation of Roundup Ready alfalfa.  40 C.F.R. § 1508.7 ("'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.") . While alfalfa is the first large scale perennial Roundup Ready crop, APHIS has deregulated other Roundup Ready crops, including corn and soybeans, and other deregulation petitions are pending.  While the deregulation of one crop in and of itself might not pose a significant

15

1  risk for the development of glyphosate resistant weeds, when all the crops are considered

2  cumulatively such a risk may become apparent.  There is nothing in the FONSI or EA that

3  suggests APHIS even considered how much Roundup use will increase, or even how much

4  such use has increased since the introduction of the other Roundup Ready crops; to the

5  contrary, the EA specifically states that it "does not address the separate issue of the potential

6  use of the herbicide glyphosate in conjunction with these plants."  AR 5501.  APHIS's failure

7  to consider in the context of the development of Roundup resistant weeds that there are

8  already other Roundup Ready crops on the market, and more crops seeking to enter the

9  market, means that it did not take the "hard look" NEPA requires.

10  **3.    Increased use of glyphosate**

11  In a related argument, plaintiffs assert that--even apart from the development of

12  glyphosate-resistant weeds--APHIS failed to consider that the deregulation of Roundup

13  Ready alfalfa will result in the increased use of Roundup, and likewise failed to consider how

14  that increased use of Roundup, perhaps doubling its use on alfalfa fields in California alone,

15  will impact the environment.  And, argue plaintiffs, APHIS should have considered this

16  increased use in the context of its deregulation of other Roundup Ready crops; in other

17  words, APHIS must inquire whether the introduction of the many Roundup Ready crops will

18  together increase the use of Roundup and impact the environment.

19  APHIS responds that there are other federal agencies, primarily the Environmental

20  Protection Agency ("EPA"), that are responsible for regulating herbicides and tolerance

21  levels in crops for such chemicals.  It also contends that there is no evidence that farmers will

22  misuse Roundup, that is, use it contrary to the manufacturer's instructions and it notes that

23  Roundup use will replace more toxic herbicides.

24  Since the Court has concluded that APHIS must consider the cumulative impact of

25  increased glyphosate use with respect to the development of glyphosate-resistant weeds,

26  APHIS will have to examine the increased use of glyphosate; thus, the Court declines to

27  specifically rule on this claim.  The Court notes, however, that it is unclear from the record

28  whether any federal agency is considering the cumulative impact of the introduction of so

**United States District Court**
For the Northern District of California

1   many glyphosate resistant crops; one would expect that some federal agency is considering

2   whether there is some risk to engineering all of America's crops to include the gene that

3   confers resistance to glyphosate.

4       **C.    Standing**

5       The government contends that plaintiffs lack standing to bring their NEPA claims.

6   While a court must ordinarily address the question of standing first, in this case the question

7   of standing is inextricably intertwined with the merits and the Court's discussion above

8   demonstrates why plaintiffs have standing.

9       Article III standing requires "that the plaintiff show (1) an injury in fact that is both

10  (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

11  (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) a

12  likelihood that the injury will be redressed by a favorable decision."  Ashley Creek

13  Phosphate Co., 420 F.3d at 937.

14      The government argues that plaintiffs have not shown injury in fact for two reasons.

15  First, it repeats its argument that economic interests do not fall "within NEPA's zone of

16  interests."  Gov't Reply at 6 (quoting Ashley Creek Phosphate Co., 420 F.3d at 938, 940).

17  As the Court explained, supra, however, economic interests that are interrelated with natural

18  or physical environmental effects fall within NEPA's zone of interests.  The alfalfa farmer

19  plaintiffs' potential economic injury arises directly from the environmental impact of

20  APHIS's decision to deregulate Roundup Ready alfalfa.  In Ashley Creek, in contrast, the

21  plaintiffs' economic injury arose from increased competition, not from any environmental

22  impact.  Id. at 940.

23      Second, the government complains that plaintiffs have not shown a sufficient

24  "geographic nexus" because they do not offer evidence that they farm near a genetically

25  engineered alfalfa crop.  The deregulation decision was made only recently, however, and at

26  oral argument plaintiffs explained that the planting of the genetically engineered crop will

27  occur in the spring; thus, it is premature for plaintiffs to show such injury.  Plaintiffs need not

28  wait until the genetically engineered alfalfa is planted near their alfalfa fields to bring suit, or

**United States District Court**
For the Northern District of California

17

1    until their fields are contaminated with genetically engineered seed mixed with non-

2    engineered seed.  "[T]o require actual evidence of environmental harm, rather than an

3    increased risk based on a violation of the statute, misunderstands the nature of environmental

4    harm and would undermine the policy of the . . . Act."  Central Delta Water Agency v.

5    United States, 306 F.3d 947, 948 (9th Cir. 2002).  "[T]he possibility of future injury may be

6    sufficient to confer standing on plaintiffs; threatened injury constitutes 'injury in fact.'"  Id. at

7    947.  As is explained above, plaintiffs have established a "reasonable probability" that their

8    organic and conventional alfalfa crops will be infected with the engineered gene, especially

9    given the undisputed concentration of alfalfa seed farms.  They have also established the

10   reasonable probability of the development of additional glyphosate resistant weeds.  Such

11   threatened injury is sufficient to confer standing.  The law does not require plaintiffs to meet

12   the impossible task of proving that their alfalfa farms have already been contaminated.  See

13   Citizens for Better Forestry v. U.S. Dep't of Agriculture, 341 F.3d 961, 971-72 (9th Cir.

14   2003) ("Were we to agree . . . that a NEPA plaintiff's standing depends on 'proof' that the

15   challenged federal project will have particular environmental effects, we would in essence be

16   requiring that the plaintiff conduct the same environmental investigation that he seeks in his

17   suit to compel the agency to undertake.") (internal quotation marks and citation omitted).

18         Finally, at oral argument the Court asked the government who would have standing if,

19   as it asserts, even the organic and conventional alfalfa farmers do not.  The government

20   responded that in its view no one has standing to challenge the deregulation decision in light

21   of APHIS's finding that the engineered gene is harmless.  As the Court explained, supra,  it

22   does not agree with APHIS's cramped reading of what constitutes an environmental impact.

23   **II.    OTHER CLAIMS**

24         Since the Court has concluded that APHIS must prepare an EIS before approving the

25   petition to deregulate Roundup Ready alfalfa, it need not address plaintiffs' claims under the

26   ESA and PPA.  The agency's decision may be different after it gathers the relevant data and

27   considers the public's comments on such data; accordingly, the Court will not now decide the

28   additional grounds for challenging the agency's decision.  See Thomas v. Petersen, 753 F.2d

United States District Court
For the Northern District of California

1    754, 761 n.4 (9th Cir. 1985).  Plaintiffs' ESA and PPA claims are therefore dismissed

2    without prejudice.

3                                            **CONCLUSION**

4          NEPA "is our basic national charter for protection of the environment."  40 C.F.R.

5    § 1500.1(a).  "NEPA emphasizes the importance of coherent and comprehensive up-front

6    environmental analysis to ensure informed decision making to the end that 'the agency will

7    not act on incomplete information, only to regret its decision after it is too late to correct.'"

8    Blue Mountains Biodiversity Project, 161 F.3d at 1216 (quoting Marsh v. Oregon Natural

9    Resources Council, 490 U.S. 360, 371 (1989)).  "An EIS is required of an agency in order

10   that it explore, more thoroughly than an EA, the environmental consequences of a proposed

11   action whenever 'substantial questions are raised as to whether a project *may* cause

12   significant [environmental] degradation."  Id.  (internal quotation marks and citation

13   omitted).

14         "That is exactly the circumstances of this case."  Id.  Substantial questions are raised

15   as to whether (1) the deregulation of Roundup Ready alfalfa without any geographic

16   restrictions will lead to the transmission of the engineered gene to organic and conventional

17   alfalfa; (2) the possible extent of such transmission; and (3) farmers' ability to protect their

18   crops from acquiring the genetically engineered gene.  Substantial questions are also raised

19   as to the extent to which Roundup Ready alfalfa will contribute to the development of

20   Roundup-resistant weeds, especially when considered in conjunction with the already

21   deregulated and soon-to-be deregulated Roundup Ready crops, and as to how farmers will

22   address such weeds.  APHIS failed to answer these substantial questions, concluding instead

23   that any environmental impact is insignificant because gene transmission is the problem of

24   the organic and conventional farmers and weeds always develop resistance to herbicides.  As

25   such reasons are not "convincing" and do not demonstrate that the agency took a "hard look"

26   at the potential environmental impacts of its deregulation decision, plaintiffs' motion for

27   summary judgment on its NEPA claim that APHIS is required to prepare an EIS is

28   GRANTED.  Defendants' cross motion on the NEPA claim is DENIED, and the parties'

cross-motions on the other claims are dismissed as moot in light of the Court's dismissal of those claims without prejudice.

The parties shall meet and confer and submit a proposed Judgment to the Court on or before February 26, 2007.

**IT IS SO ORDERED.**

Dated: Feb. 13, 2007

_____/s/_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE