IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEERTSON FARMS INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MIKE JOHANNS, et al.,<br><br>    Defendants, and<br><br>MONSANTO COMPANY, et al.,<br><br>    Intervenors-Defendants. | No. C 06-01075 CRB<br><br>**MEMORANDUM AND ORDER RE: PERMANENT INJUNCTION** |

By Memorandum and Order dated February 13, 2007, the Court concluded that the federal defendants violated the National Environmental Protection Act ("NEPA") by failing to prepare an environmental impact statement ("EIS") before deregulating alfalfa genetically engineered to resist the herbicide Roundup ("Roundup Ready alfalfa"). The Court held that an EIS is required because of the potential significant environmental impact of gene transmission; specifically, the acknowledged risk that the genetically engineered gene will "contaminate" organic and conventional alfalfa. The Court also found that the federal defendants had failed to adequately consider the deregulation decision's impact on the development of Roundup-resistant weeds.

Now pending before the Court are the parties' competing proposals for permanent injunctive relief, various motions to strike, the intervenors' motion to file a surreply, the motion of the American Farm Bureau Federation to file an amicus brief, and the intervenors' motion for reconsideration of the preliminary injunction order. The motion to file a surreply and the motion to file an amicus brief are granted.

## BACKGROUND

**A.     The NEPA Violation**

The government, specifically, the Animal and Plant Health Inspection Service ("APHIS"), chose not to prepare an EIS before it deregulated Roundup Ready alfalfa; instead, it issued a "Finding of No Significant Impact" ("FONSI"), finding that the deregulation of Roundup Ready alfalfa would not have a significant environmental impact. The Court concluded that APHIS's "no significant environmental impact" finding was erroneous. February 13, 2007 Memorandum and Order "(NEPA Order").

APHIS's position before the Court is, or at least was, that "even if deregulation of Roundup Ready alfalfa could result in the elimination of all non-genetically engineered alfalfa–in other words, there would be no alfalfa grown in the United States that does not contain the engineered gene that confers tolerance to glyphosate–such a result would still not constitute a significant environmental impact because APHIS has determined that the introduction of that gene to alfalfa is harmless to humans and livestock, that is, it is not toxic or pathogenic." Id. at 12. The Court rejected this reasoning and concluded that the contamination of conventional and organic alfalfa with the Roundup Ready gene is itself an impact that is harmful to the human environment. Id at 13-14.

Moreover, even though APHIS acknowledged that gene transmission could and had occurred with Roundup Ready alfalfa, it refused to analyze the likely extent of such gene flow and how it could be eliminated, or at least minimized; that is, how Roundup Ready alfalfa could co-exist with conventional and organic alfalfa. APHIS instead reasoned that it is, in effect, the organic and conventional alfalfa growers' responsibility to ensure that the genetically-engineered traits from neighboring crops do not spread to their own crops. Id. at

2

1  8-9. APHIS also found that gene transmission is not likely to occur with forage as opposed
2  to seed crops because forage fields are typically harvested before the seed matures. Id. at 9.
3  The Court concluded that APHIS's failure to analyze the likely extent of gene flow and
4  whether any measures could be effectively implemented to prevent such contamination did
5  not demonstrate the "hard look" required by NEPA. Id. at 9-10. APHIS's conclusion as to
6  forage crops was similarly inadequate given that it offered no evidence as to how often
7  farmers are actually able to harvest their forage crops before seed matures and it made no
8  inquiry into the likelihood of gene transmission when, due to weather, they cannot. Id. at 10.
9      APHIS had also acknowledged that the deregulation of Roundup Ready alfalfa could
10 result in the development of Roundup-resistant weeds, but in the FONSI it nevertheless
11 found this risk was not "significant" because the development of herbicide-resistant weeds is
12 common and "the agricultural community is addressing the issue." Id. at 15. The Court held
13 that this analysis, too, is not the "hard look" NEPA requires. Id.

### B. Procedural History

15     After the Court granted plaintiffs' motion for summary judgment and ordered the
16 parties to address an appropriate remedy, it granted the motions to intervene brought by the
17 following: Monsanto Company ("Monsanto"), the owner of the intellectual property rights in
18 Roundup Ready alfalfa; Forage Genetics Inc. ("Forage Genetics"), a Monsanto licensee and
19 the exclusive developer of Roundup Ready alfalfa seed; a Roundup Ready alfalfa seed
20 farmer under contract with Forage Genetics; a California farmer who, among other crops, has
21 planted 40 acres of Roundup Ready alfalfa for forage; and a dairy farmer with 300 acres
22 planted with Roundup Ready alfalfa.

23     After considering legal and evidentiary submissions from all parties, including the
24 intervenors, and having had the benefit of several hours of oral argument, the Court vacated
25 APHIS's June 2005 deregulation decision and issued a preliminary injunction which
26 maintains the status quo while at the same time allowing those farmers who had plans for the
27 imminent planting of Roundup Ready alfalfa to proceed with their planting. In particular, the
28 Court allowed all Roundup Ready alfalfa which had been planted since APHIS's

deregulation decision to be grown, harvested, and sold without restriction, but it preliminarily enjoined all future planting of Roundup Ready alfalfa beginning March 30, 2007. The delay allowed those growers who had intended to plant Roundup Ready alfalfa during the three weeks following the preliminary injunction order, and had already purchased the seed, to plant the genetically-engineered seed. All future sales of Roundup Ready alfalfa seed and post-March 30, 2007 plantings of Roundup Ready alfalfa were prohibited pending the Court's issuance of permanent injunctive relief. The Court also scheduled a hearing on the scope of the permanent injunctive relief.

The parties have filed voluminous submissions as to permanent relief. Plaintiffs seek an order maintaining the status quo: the future planting of Roundup Ready alfalfa is enjoined pending the preparation of an EIS and APHIS's decision on Monsanto's deregulation petition. They also seek to enjoin the harvesting of any previously-planted Roundup Ready alfalfa seed and to require the publication of information as to the location of current Roundup Ready alfalfa crops.

APHIS and the intervenors (collectively "defendants") oppose the maintenance of the status quo; instead, they seek a remedy that facilitates the continued and dramatic growth of the Roundup Ready alfalfa market. There are currently approximately 200,000 acres planted with Roundup Ready alfalfa for forage and another 20,000 acres planted for seed. Intervenors estimate that absent plaintiffs' proposed injunction the acreage of Roundup Ready alfalfa planted for forage will increase to more than a million acres by 2008, a five-fold increase, and there will be a proportional increase in the number of acres planted for seed. Mark McCaslin March 23 Direct Testimony at 13. Defendants' seek, in effect, a partial deregulation that permits the continued expansion of the Roundup Ready alfalfa market subject to certain conditions. Specifically, APHIS proposes to require isolation distances between Roundup Ready alfalfa crops and alfalfa seed production fields; to prohibit pollinators from being added to Roundup Ready alfalfa fields; and to require that Roundup Ready alfalfa growers identify and keep records of all alfalfa crops being grown within 500 feet of their fields. APHIS also proposes to require specific harvesting conditions

4

for Roundup Ready alfalfa fields to minimize gene flow in areas where growers are producing non-genetically engineered alfalfa seeds, including specifying when the fields must be harvested.  Finally, farm equipment used in Roundup Ready alfalfa production must be properly cleaned after use and Roundup Ready alfalfa must be handled and identified to minimize commingling after harvest.

## LEGAL STANDARD

Upon a finding of a NEPA violation an injunction does not automatically issue; "injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation." Forest Conservation Council v. U.S. Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995); see also National Parks & Conservation Ass'n. v. Babbitt, 241 F.3d 722, 737 (9th Cir. 2001) ("To determine whether injunctive relief is appropriate, 'even in the context of environmental litigation,' we apply 'the traditional balance of harms analysis.'") (internal citation omitted). "[I]n the run of the mill NEPA case, the contemplated project, whether it be a new dam or a highway extension, is simply delayed until the NEPA violation is cured," that is, the balance of harms favor issuance of an injunction. Idaho Watersheds Project v. Hahn, 307 F.3d 815, 833 (9th Cir. 2002); see also National Parks & Conservation Ass'n., 241 F.3d at 737 (holding that "where an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement").  An injunction is appropriate because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." National Parks & Conservation Ass'n., 241 F.3d at 737 (internal quotation marks and citation omitted);  see also High Sierra Hikers Association v. Blackwell, 390 F.3d 630, 642 (9th Cir. 2004) ("the presence of a strong NEPA claim gives rise to more liberal standards for granting an injunction") (internal quotation marks and citation omitted).

The Ninth Circuit has nevertheless recognized that "in 'unusual circumstances' an injunction may be withheld, or, more likely, limited in scope." National Parks &

5

Conservation Ass'n., 241 F.3d at 737 n.18; see also Forest Conservation Council, 66 F.3d at 1496 (holding that the defendants "should be allowed to present evidence to the court that 'unusual circumstances' weigh against the injunction sought").

## DISCUSSION

**A.  An Injunction Against the Continued Growth of the Roundup Ready Alfalfa Market**

The Court's preliminary injunction order maintained the status quo by prohibiting any planting of Roundup Ready alfalfa after March 30, 2007. Defendants ask the Court to permit the continued dramatic expansion of the Roundup Ready alfalfa market pending APHIS's preparation of the legally-required EIS, provided certain conditions are met. In support of their proposal, defendants offer evidence from several experts, as well as employees of the intervenors, opining that if the isolation distances and other conditions are satisfied, the risk of gene flow is so small as to be outweighed by the harm to Monsanto, Forage Genetics, seed distributors, and farmers who want to plant Roundup Ready alfalfa. As they explained at oral argument, they contend that in light of these proposed conditions, plaintiffs have not demonstrated irreparable harm and therefore a blanket prohibition on future plantings is not warranted.

After carefully reviewing defendants' voluminous evidence, including the evidence submitted in support of the intervenors' surreply, as well as plaintiffs' evidence, the Court declines to permit the expansion of the Roundup Ready alfalfa market while APHIS conducts the analysis it should have prepared before it allowed for the non-permitted introduction of the crop in the first instance.

In holding that APHIS violated NEPA, the Court concluded that APHIS had failed to adequately analyze the risk of gene flow and to what extent, if any, certain measures could be implemented to effectively prevent such contamination. Although APHIS has represented that it will take it approximately two years to prepare an EIS, it contends that during the month following this Court's summary judgment order it has conducted analysis sufficiently adequate to conclude that if its proposed conditions are imposed by the Court, gene flow will not occur, at least not in any significant respect, and therefore the Court should permit the

6

expansion of the Roundup Ready alfalfa market pending APHIS's preparation of an EIS. The Court is not persuaded.

The intervenors have requested an evidentiary hearing, apparently so the Court can assess the viability of its witnesses' opinions regarding the risk of contamination if APHIS's proposed conditions are imposed, as well as to resolve disputes with plaintiffs' witnesses. Plaintiffs and intervenors have also moved to strike much of the opposing parties' evidence on various grounds, including that a particular witness is not qualified to give the opinion stated.

To make the findings requested by defendants would require this Court to engage in precisely the same inquiry it concluded APHIS failed to do and must do in an EIS; defendants are in effect asking this Court to accept its truncated EIS without the benefit of the development of all the relevant data and, importantly, without the opportunity for and consideration of public comment. See The Lands Council v. Powell, 395 F.3d 1019, 1027 (9th Cir. 2005) ("The purpose of NEPA is to require disclosure of relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm."). "[D]etermining what measures are needed through extensive fact intensive inquiry is precisely the purpose of the long term environmental review ordered by [the Court]." Idaho Watersheds Project, 307 F.3d at 83. As the Ninth Circuit has observed,

> it would be odd to require the district court to conduct an extensive inquiry, which would by nature involve scientific determinations, in order to support interim measures that are designed to temporarily protect the environment while the [government] conducts studies in order to make the very same scientific determinations.

Id. Yet, defendants ask the Court to now conduct--based on a limited record--the very same scientific inquiry it ordered APHIS to do as part of the EIS process.

APHIS contends, in essence, that it can grant Monsanto's deregulation petition without preparation of an EIS as long as it imposes certain conditions on the introduction of the genetically-engineered crop. For example, APHIS's Director of Environmental Risk

7

Analysis Division represents that APHIS "is fully committed to preparing a comprehensive environmental impact statement (EIS) prior to deciding in the future whether [Roundup Ready Alfalfa] should be *unconditionally* deregulated." Second Declaration of Neil Hoffman (March 7, 2007) ¶ 2 (emphasis added). Hoffman's carefully chosen words reveal that APHIS is *not* committed to preparing an EIS before it conditionally deregulates Roundup Ready alfalfa, which is what it is attempting to do with its proposed permanent relief.

The Court rejects APHIS's cramped reading of this Court's Order and NEPA. APHIS's decision on Monsanto's deregulation petition is the major federal action requiring the preparation of an EIS; APHIS does not need to prepare an EIS only if it ultimately decides to *unconditionally* deregulate the genetically engineered crop. As the Court found in its NEPA Order, it is the significant threat of gene flow and the development of Roundup-resistant weeds that requires further study and analysis in an EIS so that APHIS can decide if deregulation is appropriate and, if so, under what, if any, conditions. NEPA Order at 10. The Court never suggested that APHIS could skip the EIS process and decide without any public comment that deregulation with certain conditions is appropriate.

In any event, defendants' analysis is still inadequate. They have not submitted any evidence that suggests whether, and to what extent, the proposed interim conditions will be followed, even though such conditions are similar to those already imposed by Forage Genetics in its contracts with Roundup Ready seed growers and contamination has occurred despite those conditions. Defendants simply respond that the government has the authority to enforce the conditions, but having the authority and effectively using the authority are two different matters: the government has the authority to enforce the immigration laws, but unlawful entry into the United States still occurs. Moreover, APHIS asserts that it does not have the resources to inspect the 220,000 acres currently planted with Roundup Ready alfalfa hay. Second Declaration of Neil Hoffman (March 7, 2007) at ¶ 3. It does not explain how it expects to have the resources to adequately monitor the more than one million acres of Roundup Ready alfalfa hay intervenors estimate will be planted, and the concomitant increase in seed acreage, if, as they urge, the Court does not prohibit future plantings.

Another example of the continued inadequacy of defendants' analysis is their contention that requiring growers to harvest their crops before seed sets or before ten percent bloom will virtually eliminate any chance of contamination. In its NEPA Order the Court noted that the government had "failed to consider . . . that because of weather–which is beyond a farmer's control–a farmer cannot always harvest his field at the most optimal time." NEPA Order at 10. APHIS has still not made any inquiry (that it has shared with the Court) into "how often farmers are actually able to harvest their forage crop before seeds mature and no inquiry into the likelihood of gene transmission when they cannot." Id. Indeed, at oral argument on the preliminary injunction, the Court asked Mark McCaslin, the President of Forage Genetics, whether the Court should enter an order requiring harvest at a certain point to reduce the likelihood of gene flow. Mr. McCaslin candidly responded: "In the midwest where there is no seed production, that would be a disaster because there is–the challenge in the midwest is usually harvesting around the weather." March 8, 2007 Transcript at 27.

With this context in mind, the Court finds that plaintiffs have sufficiently established irreparable injury and that the balance of the equities weighs in favor of maintenance of the status quo and against allowing the continued expansion of the Roundup Ready alfalfa market pending the government's completion of the EIS. As the Court explained in its NEPA Order, contamination of organic and conventional alfalfa crops with the genetically engineered gene has occurred and defendants acknowledge as much. Such contamination is irreparable environmental harm. The contamination cannot be undone; it will destroy the crops of those farmers who do not sell genetically engineered alfalfa. Moreover, it is not a one season loss; alfalfa is a perennial crop and once removed cannot be replanted for two to four years. Mark McCaslin March 23, 2007 Direct Testimony at 6.

The harm to these farmers and consumers who do not want to purchase genetically engineered alfalfa or animals fed with such alfalfa outweighs the economic harm to Monsanto, Forage Genetics and those farmers who desire to switch to Roundup Ready alfalfa. Roundup Ready alfalfa is only 15 percent of Forage Genetics' total revenue and much, much less of Monsanto's. Moreover, intervenors do not contend that the harvested but

9

unsold seed cannot be stored until–and if–APHIS decides to deregulate Roundup Ready alfalfa after conducting an objective and thorough environmental analysis. The loss of anticipated revenue to Monsanto and Forage Genetics in the meantime "does not outweigh the potential irreparable damage to the environment." National Park & Conservation Ass'n., 241 F.3d at 738. Moreover, neither Monsanto nor Forage Genetics "have cause to claim surprise as a result of any injunction." Id. They were aware of plaintiffs' objections to the deregulation decision at the time it was made and were aware of plaintiffs' lawsuit; they nonetheless chose to market Roundup Ready alfalfa.

The desire of some farmers to plant *more* Roundup Ready alfalfa or to *switch to* Roundup Ready alfalfa, that is, to do something different from what they have done in the past, similarly does not outweigh the potential for irreparable harm. And if these farmers were not aware of the plaintiffs' challenge to Roundup Ready alfalfa, that is a matter to raise with Monsanto and Forage Genetics. See National Park & Conservation Ass'n., 241 F.3d at 738 (noting that cruise ship passengers who were not warned by carrier of lawsuit challenging cruises "were not well served by that company").

Allowing an expansion of the Roundup Ready alfalfa market pending the preparation of the EIS would be unprecedented. None of the cases cited by defendants allowed for an *increase* in the activity that posed the risk to environment. In Idaho Watersheds Project, for example, the district court found that the Bureau of Land Management had violated NEPA by issuing permits for cattle grazing without preparing the required environmental documentation. The district court considered and rejected a complete halt to all grazing, concluding that such a remedy would be too drastic. Id. at 833. Instead, the court allowed the previously-permitted grazing to continue pending the BLM's completion of its environmental review, subject to certain conditions designed to mitigate the harm from the continued grazing. Id. The court did not, however, allow the BLM to issue additional permits, which is essentially what defendants ask for here. The "middle ground" taken by the court in Idaho Watersheds is the approach taken here: as will be discussed below, the Court is not requiring those farmers who have already planted Roundup Ready alfalfa to

10

destroy their crops; instead, the Court is prohibiting the introduction of any new Roundup Ready crops.

In High Sierra Hikers Association, another case cited by defendants, the court held that the government violated NEPA by issuing multi-year special-use permits to commercial outfitters and guides in the John Muir and Ansel Adams wilderness areas without first preparing and EIS. 390 F.3d at 640-41. The court did not require the permitted packers to cease operations; instead, the court crafted a remedy that allowed for the continued operations of the packers, provided the current levels of use were reduced by 20 percent. Id. at 642-43. Again, the court did not allow for the packers' operations to increase–or for new permits to be issued; to the contrary, the court reduced the level of commercial pack operations. Here, in contrast, defendants seek to *dramatically increase the amount of acres planted with Roundup Ready alfalfa* even though the Court has ruled that the government should have prepared an EIS before allowing the plantings in the first place. See also Sierra Club v. Penfold, 857 F.2d 1307, 1316-17 (9th Cir. 1988) (allowing mining operations begun prior to court's finding of NEPA violation to be completed, but prohibiting any additional mining operations); Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152, 1154-55, 1157-58 (9th Cir. 1988) (after finding that government awarded mining leases three years earlier in violation of NEPA, the district court suspended the mining operations in all but two of the mines; the Ninth Circuit held that the district court had discretion to balance the equities to allow the mining operations to continue, although it had done so on an inadequate record, but the court did not allow for an increase in mining); Westlands Water Dist. v. U.S. Dept. of Interior, 275 F.Supp.2d 1157 (E.D. Cal. 2002) (enjoining part of project, but allowing part of project to continue in light of a congressional mandate; court did not allow for an increase in the project pending completion of the environmental review); Wilderness Watch v. U.S. Forest Service, 143 F.Supp.2d 1186 (D. Mont. 2000) (court refused to order the destruction of wilderness lodge built without the required environmental assessments; court did not allow for the future construction of lodges while the environmental review was pending).

11

Finally, the Court rejects defendants' assertion that allowing an expansion in the Roundup Ready alfalfa market is in the public interest because it promotes the use of less toxic herbicides. The record reflects that organic and most conventional forage alfalfa is grown without the use of any herbicides. In any event, a finding that increasing the use of Roundup is in the public interest is premature in light of APHIS's failure to analyze the potential for the development of Roundup-resistant weeds. Moreover, it is not in the public interest to take action that has the potential of eliminating the availability of a non-genetically engineered crop without adequate investigation into the long term impact of such action; rather, the Court finds that it is in the public interest to delay the further introduction of Roundup Ready alfalfa into the environment while APHIS studies the environmental consequences of such action.

In sum, after balancing all of the equities, the Court in its discretion finds that an injunction maintaining the status quo by prohibiting the planting of Roundup Ready alfalfa after March 30, 2007 is appropriate. The Court cautions that it does not intend its injunction to apply to plantings of Roundup Ready alfalfa as a regulated article under permit from APHIS. While some lawsuits have challenged APHIS's permitting process for regulated articles, see, e.g., Int'l Center for Technology Assessment v. Johanns, 473 F.Supp.2d 9 (D.D.C. 2007), this lawsuit challenges APHIS's action on Monsanto's deregulation petition. And plaintiffs have not established that APHIS will avoid the import of this Court's injunction by abusing the permit process. APHIS has represented under oath that its current permitting process is designed to regulate small scale field tests and that it does not have the resources to provide permits for and adequately monitor large acreage of Roundup Ready alfalfa. Second Declaration of Neil Hoffman (March 7, 2007) ¶ 3.

**B.     Already Planted Roundup Ready Alfalfa**

As the Court noted in its preliminary injunction order, some growers have already planted Roundup Ready alfalfa in reliance on the federal defendants' June 2005 deregulation decision. Plaintiffs do not seek to enjoin such forage alfalfa from being grown, harvested and sold, and the Court agrees that such a remedy would be too drastic, especially in light of

the Court's order capping the number of acres of Roundup Ready alfalfa. See Seattle Audubon Soc'y v. Evans, 771 F.Supp. 1081, 1087-95 (W.D. Wash. 1991) (taking logging industry interests into account in conducting equitable balancing for environmental law violation, resulting in injunction of future timber sales, but not existing sales), aff'd, 952 F.2d 297, 298 (9th Cir. 1991).

Plaintiffs do seek to enjoin the harvesting and sale of already planted Roundup Ready alfalfa seed. They contend that the risk of contamination from the mixing of the genetically-engineered seed with non-engineered seed outweighs any harm to those farmers with contracts with Forage Genetics to produce such seeds. The Court declines to impose such an order and interfere with the contracts entered into by these farmers. The record reflects that Forage Genetics has contracts with 76 farmers to grow Roundup Ready alfalfa seed. The financial burden to these farmers of an injunction preventing them from fulfilling their contracts outweighs the harm to the human environment in these limited circumstances. See Amoco Production Co. v. Gambell, 480 U.S. 531, 541, 544-45 (1987) (noting, in summarizing Ninth Circuit law, that "unusual circumstances" weighing against injunctive relief include "those in which an injunction would interfere with a long-term contractual relationship"); Sierra Club, 857 F.2d at 1316-17 (allowing mining operations begun prior to court's finding of NEPA violation to be completed, but prohibiting any additional mining operations).

The Court will impose certain conditions in an attempt to minimize the risk of gene flow from the already-planted genetically engineered alfalfa to organic and conventional alfalfa. As the alfalfa has already been planted, the Court will not impose isolation distances; however, the Court will adopt the relevant conditions proposed by APHIS. In particular, within 45 days of the date of this Order, APHIS shall issue an administrative order imposing the following requirements:

I.   Pollinators shall not be added to Roundup Ready alfalfa fields grown only for hay production.

13

  II. Farm equipment used in Roundup Ready alfalfa production shall be properly cleaned after use.

    A. Cleaning procedures for harvesters, tractors and tillage equipment shall be submitted to and approved by APHIS prior to implementation.

    B. Cleaning procedures shall be designed to minimize the risk of Roundup Ready alfalfa seed and hay movement from authorized production site.

    C. All equipment shall be cleaned in accordance with the approved procedures before it leaves the farm on which in came in contact with Roundup Ready alfalfa.

  III. Roundup Ready alfalfa shall be handled and clearly identified to minimize commingling after harvest. Immediately after harvest, growers or seed producers shall store Roundup Ready alfalfa in specifically designated and clearly labeled containers.

As all Roundup Ready seed growers are under contract with Forage Genetics, and as all Roundup Ready alfalfa farmers have a license with Monsanto, Monsanto, Forage Genetics and APHIS shall work together to ensure that all Roundup Ready alfalfa farmers are aware of the above requirements.

It is also important that the organic and conventional alfalfa farmers learn where Roundup Ready alfalfa is grown so that they can test their own crops to determine if there has been contamination. Forage Genetics maintains GPS or plat mats identifying the location of all alfalfa seed production acreage. Mark McCaslin March 23 Direct Testimony at 9. Forage Genetics also requires growers who purchase Roundup Ready alfalfa in 17 Western states to provide field size and GPS locations at the time of purchase "to enable monitoring and enforcement of the Monsanto trait stewardship measures." Id. at 16. Within 30 days of the judgment, Forage Genetics shall provide the above identifying information to APHIS and APHIS shall make such information publicly available as soon as practicable, including, but not limited to, making such information available on the appropriate government website. Forage Genetics shall also use its best efforts to obtain field size and GPS locations of

Roundup Ready alfalfa in the remaining states and provide such information to APHIS for public disclosure.

## CONCLUSION

For the reasons explained above, the intervenors' motion for reconsideration of the preliminary injunction order is DENIED. The Court will enter a final judgment (1) vacating the June 2005 deregulation decision; (2) ordering the government to prepare an EIS before it makes a decision on Monsanto's deregulation petition; (3) enjoining the planting of any Roundup Ready alfalfa in the United States after March 30, 2007 pending the government's completion of the EIS and decision on the deregulation petition; and (4) imposing the above conditions on the handling and identification of already-planted Roundup Ready alfalfa.

The parties shall jointly submit a written status report within 60 days of the date of this Order to update the Court on defendants' compliance with the injunction.

**IT IS SO ORDERED.**

Dated: May 3, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2006\1075\orderrepermanentrelief.wpd   15