1 | MARTHA C. LUEMERS, SBN 104658
DORSEY & WHITNEY LLP
2 | 1717 Embarcadero Road
Palo Alto, California 94303
3 | Telephone: (650) 857-1717
Facsimile: (650) 857-1288
4 | E-Mail: eFilingPA@dorsey.com

5 | B. ANDREW BROWN, *Pro hac vice*
DORSEY & WHITNEY LLP
6 | 50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
7 | Telephone: (612) 340-5612
Facsimile: (612) 340-8800
8 | E-Mail: brown.andrew@dorsey.com

**FILED**

AUG 1 6 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9 | Attorneys for Intervenor-Defendants
Forage Genetics, Inc., John Grover, Daniel Mederos and
10 | Mark Watte

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

13 | GEERTSON SEED FARMS INC., TRASK
FAMILY SEEDS, CENTER FOR FOOD
14 | SAFETY, BEYOND PESTICIDES,
CORNUCOPIA INSTITUTE, DAKOTA
15 | RESOURCE COUNCIL, NATIONAL FAMILY
FARM COALITION, SIERRA CLUB, AND
16 | WESTERN ORGANIZATION OF RESOURCE
COUNCILS,

**NO. C 06-01075 CRB**

**NOTICE OF APPEAL**

17 | Plaintiffs,

18 | v.

19 | MIKE JOHANNS, *in his official capacity as*
*Secretary of the United States Department of*
20 | *Agriculture,* RON DEHAVEN *in his official*
*capacity as Administrator of the Animal Plant*
21 | *Health and Inspection Service, United States*
*Department of Agriculture, and* STEVE
22 | JOHNSON *in his official capacity as*
*Administrator of the United States Environmental*
23 | *Protection Agency,*

24 | Defendants,

25 | and

26 | MONSANTO COMPANY, FORAGE GENETICS,
INC., JOHN GROVER, DANIEL MEDEROS, and
27 | MARK WATTE,

28 | Intervenor-Defendants.

-1-

1      Intervenor-Defendants Forage Genetics, Inc., John Grover, Daniel Mederos, and Mark

2 Watte appeal to the United States Court of Appeals for the Ninth Circuit from the Amended

3 Judgment entered in this action on July 23, 2007, including the May 3, 2007 Judgment

4 incorporated therein and all orders subsumed within those judgments, including but not limited to

5 the orders vacating the June 2005 Roundup Ready alfalfa deregulation order issued to the United

6 States Department of Agriculture, Animal, Plant, Health and Inspection Service ("APHIS"),

7 requiring APHIS to prepare an Environmental Impact Statement before deciding on the

8 deregulation petition submitted by Forage Genetics, Inc. and Monsanto, and granting Plaintiffs'

9 request for permanent injunctive relief, including a ban on planting of Roundup Ready Alfalfa,

10 known as J101 and J163. True and correct copies of the Judgments and Orders are attached

11 hereto as Exhibit A.

12      Intervenor-Defendants Forage Genetics, Inc., John Grover, Daniel Mederos, and Mark

13 Watte hereby submit with this Notice a filing fee for the Notice of Appeal in the amount of

14 $455.00, payable to the Clerk, U.S. District Court.

15 Dated: August 16, 2007

16                          DORSEY & WHITNEY LLP

17

18                          By _Mha C. Luemers_

19                          MARTHA C. LUEMERS, SBN 104658
                         B. ANDREW BROWN, *Pro hac vice*
                         Attorneys for Intervenor-Defendants

20                          Forage Genetics, Inc., John Grover, Daniel
                         Mederos, and Mark Watte

21

22

23

24

25

26

27

28

                                           -2-

1   SCOTT N. SCHOOLS, United States Attorney (CA Bar No. SC 999)

2   CHARLES O'CONNOR, Assistant U.S. Attorney (CA Bar No. 5630)
    10th Floor Federal Building, Box 36055

3   450 Golden Gate Avenue
    San Francisco, California 94102

4   MATT MCKEOWN

5   Acting Assistant Attorney General
    KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar No. 469615)

6   ROBERT P. WILLIAMS, Trial Attorney (DC Bar No. 474730)

7   U.S. Department of Justice
    Environment and Natural Resources Division

8   P.O. Box 7369
    Washington, D.C. 20044-7369

9   Telephone: (202) 305-0210

10  Facsimile: (202) 305-0275
    Kristen.Floom@usdoj.gov

11  GREGORY PAGE, Trial Attorney (DC Bar No. 398121)

12  U.S. Department of Justice
    Environment and Natural Resources Division

13  General Litigation Section
    P.O. Box 663

14  Washington, D.C. 20044-0663

15  Telephone: (202) 305-0446
    Facsimile: (202) 305-0506

16  Gregory.Page@usdoj.gov

17
    Attorneys for Federal Defendants

18

19              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION

20

21  GEERTSON SEED FARMS INC., et al.  )   Case No. C-06-1075 (CRB) (EDL)
                                       )
22           Plaintiffs,               )
                                       )   **AMENDED JUDGMENT**
23      vs.                            )
                                       )
24  MIKE JOHANNS, et al.,              )
                                       )
25           Defendants,               )

26

27      On May 3, 2007, this Court issued its Judgment. Thereafter, the Court granted

28  defendants' Rule 59 Motion to Alter or Amend 3 May 2007 Judgment. Order Re: Motion

    to Amend Judgment (filed 26 June 2007)("Rule 59 Order"). Pursuant to the Rule 59 Order,

1   the Court's Judgment is hereby amended, as follows.

2   **I. Storing Roundup Ready Alfalfa in Clearly-Labeled Containers**

3        In Section III of the Judgment, the Court required APHIS to impose certain handling,
4   identification, and containment standards for Roundup Ready Alfalfa ("RRA") in an
5   administrative order.

6        These standards shall not be applied to RRA hay, unless that hay leaves its farm of
7   origin.  Where RRA hay leaves its farm of origin, it need not be containerized but instead
8   shall be clearly labeled.

9   **II. Cleaning Procedures**

10        In Section II, Subsection A of the Judgment, the Court required APHIS to issue an
11   administrative order enabling it to both impose and individually approve certain cleaning
12   procedures "prior to implementation."

13        In lieu of this requirement that APHIS approve individual cleaning procedures before
14   implementation, APHIS shall publish and distribute a best practices guide for the cleaning
15   of equipment used to produce RRA hay and seed.  This guide shall be available on the
16   APHIS website by July 13, 2007, and APHIS shall also begin distributing it by mail at that
17   time to RRA hay and seed producers.

18   **III. Deadline for Providing RRA Field Information to the Government**

19        The Judgment also required Monsanto and Forage Genetics to provide APHIS with
20   the RRA field location information described therein.  On or before August 27, 2007,
21   Monsanto and Forage Genetics shall file a status report describing their progress in supplying
22   the remaining RRA hay crop location information (1) specific to the 17 Western states and
23   (2) specific to the eastern United States.

24   **IV. Public Disclosure of the Location of RRA**

25        In its Judgment, the Court required APHIS to disclose RRA location information on
26   its website "as soon as practicable."  Pursuant to the Court's Rule 59 Order, APHIS will
27   disclose the RRA locations to farmers only, under a three-part disclosure mechanism.

28

- 2 -

1    First, within one week after entry of this Court's Amended Judgment, APHIS shall

2    disclose to farmers the counties in the 17 Western states in which RRA seed or hay fields are

3    located.   This disclosure shall be on the website of APHIS' Biotechnology Regulatory

4    Service (APHIS/BRS) homepage. It shall be accessed by a link at this website's bottom right

5    side that reads "I want to learn about the status of Roundup Ready alfalfa." Further, on the

6    same website, and within 30 days of the status report filed by Monsanto and Forage Genetics,

7    described above, APHIS shall publish a time line for the expected disclosure of RRA location

8    information for the remaining Eastern states.

9    Second, within two weeks after entry of the Court's Amended Judgment, APHIS shall

10   specify both on this website and in a the Federal Register a toll-free number that farmers in

11   or adjacent to those identified counties may use to request the distances from the nearest

12   RRA fields to their crops. Upon calling this number, a farmer shall certify to APHIS that the

13   caller is a farmer that either grows alfalfa now or intends to grow alfalfa at an existing

14   location in or adjacent to a county identified on the APHIS website.

15   Third, APHIS will respond as quickly as practicable to requests from farmers through

16   the toll free number, either immediately or by the next working day whenever feasible, and

17   will use its best efforts when questions arise regarding imprecise data or under other

18   unanticipated circumstances to respond within three working days. In responding to a request

19   by a farmer hereunder, APHIS will provide the requesting farmer with the distances, within

20   the county or adjacent county identified, from the nearest RRA fields to the requestor's crop

21   location(s). APHIS shall provide such distances for five such RRA fields if five or more of

22   such fields exist in the relevant county or adjacent county.

23   **V. APHIS Administrative Order**

24
     APHIS shall implement the Court's Judgment, as amended, by issuing an
25
     administrative order on or before July 13, 2007. It shall be posted on the APHIS website.
26

27

28

- 3 -

1

2   Signed:  July 23, 2007

3   CHARLES R. BREYER

4   U.S. District    IT IS SO ORDERED

5

6   Judge Charles R. Breyer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   GEERTSON FARMS INC., et al.,                  No. C 06-01075 CRB

12              Plaintiffs,                         **JUDGMENT**

13        v.

14   MIKE JOHANNS, et al.,

15              Defendants, and

16   MONSANTO COMPANY, et al.,

17              Intervenors-Defendants.

18   _____/

19        The Court having granted plaintiffs' motion for summary judgment on their NEPA

20   claims by Memorandum and Order dated February 13, 2007, and having dismissed plaintiffs'

21   remaining claims, judgment is entered in favor of plaintiffs and against the federal defendants

22   on the NEPA claims.

23        The federal defendants' June 14, 2005 Determination of Nonregulated Status for

24   Alfalfa Genetically Engineered for Tolerance to the Herbicide Glyphosate is VACATED.

25   Before granting Monsanto's deregulation petition, even in part, the federal defendants shall

26   prepare an environmental impact statement ("EIS"). Until the federal defendants prepare the

27   EIS and decide the deregulation petition, no Roundup Ready alfalfa, known as J101 and

28   J163, may be planted. This injunction does not apply to the permit process for regulated

United States District Court

For the Northern District of California

1  articles administered by the Animal and Plant Health Inspection Service ("APHIS").

2  　　　Roundup Ready alfalfa planted before March 30, 2007 may be grown, harvested and

3  sold subject to the following conditions.  In particular, within 45 days of this Judgment, the

4  federal defendants shall issue an administrative order imposing the following requirements:

5  　　I.　　Pollinators shall not be added to Roundup Ready alfalfa fields grown only for

6  　　　　　hay production.

7  　　II.　　Farm equipment used in Roundup Ready alfalfa production shall be properly

8  　　　　　cleaned after use.

9  　　　　　A.　　Cleaning procedures for harvesters, tractors and tillage equipment shall

10 　　　　　　　　be submitted to and approved by APHIS prior to implementation.

11 　　　　　B.　　Cleaning procedures shall be designed to minimize the risk of Roundup

12 　　　　　　　　Ready alfalfa seed and hay movement from authorized production sites.

13 　　　　　C.　　All equipment shall be cleaned in accordance with the approved

14 　　　　　　　　procedures before it leaves the farm on which in came in contact with

15 　　　　　　　　Roundup Ready alfalfa.

16 　　III.　　Roundup Ready alfalfa shall be handled and clearly identified to minimize

17 　　　　　commingling after harvest.  Immediately after harvest, growers or seed

18 　　　　　producers shall store Roundup Ready alfalfa in specifically designated and

19 　　　　　clearly labeled containers.

20 　　　　Monsanto, Forage Genetics and APHIS shall work together to ensure that all Roundup

21 Ready alfalfa farmers are aware of the above requirements.

22 　　　　Within 30 days of the judgment, Forage Genetics shall provide APHIS with GPS or

23 plat mats identifying the location of all Roundup Ready alfalfa seed production acreage as

24 well as the field size and GPS locations of Roundup Ready alfalfa hay fields for the 17

25 Western states in which Forage Genetics collects such information.  APHIS shall make such

26 information publicly available as soon as practicable, including, but not limited to, making

27 such information available on the appropriate government website.  Forage Genetics shall

28

United States District Court
For the Northern District of California

Case 3:06-cv-01075-CRB    Document 200    Filed 05/03/2007    Page 3 of 3

1   also use its best efforts to obtain field size and GPS locations of Roundup Ready alfalfa in

2   the remaining states and provide such information to APHIS for public disclosure.

3      The parties shall jointly submit a written status report within 60 days of the date of

4   this Judgment to update the Court on defendants' compliance with the injunction.

5      **IT IS SO ORDERED.**

6

7   Dated: May 3, 2007

           CHARLES R. BREYER
           UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

G:\CRBALL\2006\1075\judgment.wpd      3



1
2
3
4
5
6
7
8      IN THE UNITED STATES DISTRICT COURT

9      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   GEERTSON FARMS INC., et al.,                    No. C 06-01075 CRB

12            Plaintiffs,                            **MEMORANDUM AND ORDER RE:
                                                     PERMANENT INJUNCTION**
13       v.

14   MIKE JOHANNS, et al.,

15            Defendants, and

16   MONSANTO COMPANY, et al.,

17            Intervenors-Defendants.
                                              /
18

19        By Memorandum and Order dated February 13, 2007, the Court concluded that the

20   federal defendants violated the National Environmental Protection Act ("NEPA") by failing

21   to prepare an environmental impact statement ("EIS") before deregulating alfalfa genetically

22   engineered to resist the herbicide Roundup ("Roundup Ready alfalfa"). The Court held that

23   an EIS is required because of the potential significant environmental impact of gene

24   transmission; specifically, the acknowledged risk that the genetically engineered gene will

25   "contaminate" organic and conventional alfalfa. The Court also found that the federal

26   defendants had failed to adequately consider the deregulation decision's impact on the

27   development of Roundup-resistant weeds.

28

United States District Court
For the Northern District of California

1    Now pending before the Court are the parties' competing proposals for permanent

2 injunctive relief, various motions to strike, the intervenors' motion to file a surreply, the

3 motion of the American Farm Bureau Federation to file an amicus brief, and the intervenors'

4 motion for reconsideration of the preliminary injunction order. The motion to file a surreply

5 and the motion to file an amicus brief are granted.

**BACKGROUND**

**A.    The NEPA Violation**

8    The government, specifically, the Animal and Plant Health Inspection Service

9 ("APHIS"), chose not to prepare an EIS before it deregulated Roundup Ready alfalfa;

10 instead, it issued a "Finding of No Significant Impact" ("FONSI"), finding that the

11 deregulation of Roundup Ready alfalfa would not have a significant environmental impact.

12 The Court concluded that APHIS's "no significant environmental impact" finding was

13 erroneous. February 13, 2007 Memorandum and Order "(NEPA Order").

14    APHIS's position before the Court is, or at least was, that "even if deregulation of

15 Roundup Ready alfalfa could result in the elimination of all non-genetically engineered

16 alfalfa–in other words, there would be no alfalfa grown in the United States that does not

17 contain the engineered gene that confers tolerance to glyphosate–such a result would still not

18 constitute a significant environmental impact because APHIS has determinated that the

19 introduction of that gene to alfalfa is harmless to humans and livestock, that is, it is not toxic

20 or pathogenic." Id. at 12. The Court rejected this reasoning and concluded that the

21 contamination of conventional and organic alfalfa with the Roundup Ready gene is itself an

22 impact that is harmful to the human environment. Id at 13-14.

23    Moreover, even though APHIS acknowledged that gene transmission could and had

24 occurred with Roundup Ready alfalfa, it refused to analyze the likely extent of such gene

25 flow and how it could be eliminated, or at least minimized; that is, how Roundup Ready

26 alfalfa could co-exist with conventional and organic alfalfa. APHIS instead reasoned that it

27 is, in effect, the organic and conventional alfalfa growers' responsibility to ensure that the

28 genetically-engineered traits from neighboring crops do not spread to their own crops. Id. at

United States District Court
For the Northern District of California

2

1    8-9. APHIS also found that gene transmission is not likely to occur with forage as opposed
2    to seed crops because forage fields are typically harvested before the seed matures. Id. at 9.
3    The Court concluded that APHIS's failure to analyze the likely extent of gene flow and
4    whether any measures could be effectively implemented to prevent such contamination did
5    not demonstrate the "hard look" required by NEPA. Id. at 9-10. APHIS's conclusion as to
6    forage crops was similarly inadequate given that it offered no evidence as to how often
7    farmers are actually able to harvest their forage crops before seed matures and it made no
8    inquiry into the likelihood of gene transmission when, due to weather, they cannot. Id. at 10.

9         APHIS had also acknowledged that the deregulation of Roundup Ready alfalfa could
10   result in the development of Roundup-resistant weeds, but in the FONSI it nevertheless
11   found this risk was not "significant" because the development of herbicide-resistant weeds is
12   common and "the agricultural community is addressing the issue." Id. at 15. The Court held
13   that this analysis, too, is not the "hard look" NEPA requires. Id.

14   **B.    Procedural History**

15        After the Court granted plaintiffs' motion for summary judgment and ordered the
16   parties to address an appropriate remedy, it granted the motions to intervene brought by the
17   following: Monsanto Company ("Monsanto"), the owner of the intellectual property rights in
18   Roundup Ready alfalfa; Forage Genetics Inc. ("Forage Genetics"), a Monsanto licensee and
19   the exclusive developer of Roundup Ready alfalfa seed; a Roundup Ready alfalfa seed
20   farmer under contract with Forage Genetics; a California farmer who, among other crops, has
21   planted 40 acres of Roundup Ready alfalfa for forage; and a dairy farmer with 300 acres
22   planted with Roundup Ready alfalfa.

23        After considering legal and evidentiary submissions from all parties, including the
24   intervenors, and having had the benefit of several hours of oral argument, the Court vacated
25   APHIS's June 2005 deregulation decision and issued a preliminary injunction which
26   maintains the status quo while at the same time allowing those farmers who had plans for the
27   imminent planting of Roundup Ready alfalfa to proceed with their planting. In particular, the
28   Court allowed all Roundup Ready alfalfa which had been planted since APHIS's

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   deregulation decision to be grown, harvested, and sold without restriction, but it preliminarily

2   enjoined all future planting of Roundup Ready alfalfa beginning March 30, 2007.  The delay

3   allowed those growers who had intended to plant Roundup Ready alfalfa during the three

4   weeks following the preliminary injunction order, and had already purchased the seed, to

5   plant the genetically-engineered seed. All future sales of Roundup Ready alfalfa seed and

6   post-March 30, 2007 plantings of Roundup Ready alfalfa were prohibited pending the

7   Court's issuance of permanent injunctive relief.  The Court also scheduled a hearing on the

8   scope of the permanent injunctive relief.

9        The parties have filed voluminous submissions as to permanent relief.  Plaintiffs seek

10   an order maintaining the status quo: the future planting of Roundup Ready alfalfa is enjoined

11   pending the preparation of an EIS and APHIS's decision on Monsanto's deregulation

12   petition.  They also seek to enjoin the harvesting of any previously-planted Roundup Ready

13   alfalfa seed and to require the publication of information as to the location of current

14   Roundup Ready alfalfa crops.

15        APHIS and the intervenors (collectively "defendants") oppose the maintenance of the

16   status quo; instead, they seek a remedy that facilitates the continued and dramatic growth of

17   the Roundup Ready alfalfa market.  There are currently approximately 200,000 acres planted

18   with Roundup Ready alfalfa for forage and another 20,000 acres planted for seed.

19   Intervenors estimate that absent plaintiffs' proposed injunction the acreage of Roundup

20   Ready alfalfa planted for forage will increase to more than a million acres by 2008, a five-

21   fold increase, and there will be a proportional increase in the number of acres planted for

22   seed.  Mark McCaslin March 23 Direct Testimony at 13.  Defendants' seek, in effect, a

23   partial deregulation that permits the continued expansion of the Roundup Ready alfalfa

24   market subject to certain conditions.  Specifically, APHIS proposes to require isolation

25   distances between Roundup Ready alfalfa crops and alfalfa seed production fields; to

26   prohibit pollinators from being added to Roundup Ready alfalfa fields; and to require that

27   Roundup Ready alfalfa growers identify and keep records of all alfalfa crops being grown

28   within 500 feet of their fields.  APHIS also proposes to require specific harvesting conditions

4

1 for Roundup Ready alfalfa fields to minimize gene flow in areas where growers are
2 producing non-genetically engineered alfalfa seeds, including specifying when the fields
3 must be harvested. Finally, farm equipment used in Roundup Ready alfalfa production must
4 be properly cleaned after use and Roundup Ready alfalfa must be handled and identified to
5 minimize commingling after harvest.

**LEGAL STANDARD**

7 Upon a finding of a NEPA violation an injunction does not automatically issue;
8 "injunctive relief is an equitable remedy, requiring the court to engage in the traditional
9 balance of harms analysis, even in the context of environmental litigation." Forest
10 Conservation Council v. U.S. Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995); see also
11 National Parks & Conservation Ass'n. v. Babbitt, 241 F.3d 722, 737 (9th Cir. 2001) ("To
12 determine whether injunctive relief is appropriate, 'even in the context of environmental
13 litigation,' we apply 'the traditional balance of harms analysis.'") (internal citation omitted).
14 "[I]n the run of the mill NEPA case, the contemplated project, whether it be a new dam or a
15 highway extension, is simply delayed until the NEPA violation is cured," that is, the balance
16 of harms favor issuance of an injunction. Idaho Watersheds Project v. Hahn, 307 F.3d 815,
17 833 (9th Cir. 2002); see also National Parks & Conservation Ass'n., 241 F.3d at 737
18 (holding that "where an EIS is required, allowing a potentially environmentally damaging
19 project to proceed prior to its preparation runs contrary to the very purpose of the statutory
20 requirement"). An injunction is appropriate because "[e]nvironmental injury, by its nature,
21 can seldom be adequately remedied by money damages and is often permanent or at least of
22 long duration, i.e., irreparable." National Parks & Conservation Ass'n., 241 F.3d at 737
23 (internal quotation marks and citation omitted); see also High Sierra Hikers Association v.
24 Blackwell, 390 F.3d 630, 642 (9th Cir. 2004) ("the presence of a strong NEPA claim gives
25 rise to more liberal standards for granting an injunction") (internal quotation marks and
26 citation omitted).

27 The Ninth Circuit has nevertheless recognized that "in 'unusual circumstances' an
28 injunction may be withheld, or, more likely, limited in scope." National Parks &

United States District Court
For the Northern District of California

5

Conservation Ass'n., 241 F.3d at 737 n.18; see also Forest Conservation Council, 66 F.3d at 1496 (holding that the defendants "should be allowed to present evidence to the court that 'unusual circumstances' weigh against the injunction sought").

## DISCUSSION

**A.    An Injunction Against the Continued Growth of the Roundup Ready Alfalfa Market**

The Court's preliminary injunction order maintained the status quo by prohibiting any planting of Roundup Ready alfalfa after March 30, 2007. Defendants ask the Court to permit the continued dramatic expansion of the Roundup Ready alfalfa market pending APHIS's preparation of the legally-required EIS, provided certain conditions are met. In support of their proposal, defendants offer evidence from several experts, as well as employees of the intervenors, opining that if the isolation distances and other conditions are satisfied, the risk of gene flow is so small as to be outweighed by the harm to Monsanto, Forage Genetics, seed distributors, and farmers who want to plant Roundup Ready alfalfa. As they explained at oral argument, they contend that in light of these proposed conditions, plaintiffs have not demonstrated irreparable harm and therefore a blanket prohibition on future plantings is not warranted.

After carefully reviewing defendants' voluminous evidence, including the evidence submitted in support of the intervenors' surreply, as well as plaintiffs' evidence, the Court declines to permit the expansion of the Roundup Ready alfalfa market while APHIS conducts the analysis it should have prepared before it allowed for the non-permitted introduction of the crop in the first instance.

In holding that APHIS violated NEPA, the Court concluded that APHIS had failed to adequately analyze the risk of gene flow and to what extent, if any, certain measures could be implemented to effectively prevent such contamination. Although APHIS has represented that it will take it approximately two years to prepare an EIS, it contends that during the month following this Court's summary judgment order it has conducted analysis sufficiently adequate to conclude that if its proposed conditions are imposed by the Court, gene flow will not occur, at least not in any significant respect, and therefore the Court should permit the

United States District Court
For the Northern District of California

1  expansion of the Roundup Ready alfalfa market pending APHIS's preparation of an EIS.
2  The Court is not persuaded.

3    The intervenors have requested an evidentiary hearing, apparently so the Court can
4  assess the viability of its witnesses' opinions regarding the risk of contamination if APHIS's
5  proposed conditions are imposed, as well as to resolve disputes with plaintiffs' witnesses.
6  Plaintiffs and intervenors have also moved to strike much of the opposing parties' evidence
7  on various grounds, including that a particular witness is not qualified to give the opinion
8  stated.

9    To make the findings requested by defendants would require this Court to engage in
10 precisely the same inquiry it concluded APHIS failed to do and must do in an EIS;
11 defendants are in effect asking this Court to accept its truncated EIS without the benefit of
12 the development of all the relevant data and, importantly, without the opportunity for and
13 consideration of public comment. See The Lands Council v. Powell, 395 F.3d 1019, 1027
14 (9th Cir. 2005) ("The purpose of NEPA is to require disclosure of relevant environmental
15 considerations that were given a 'hard look' by the agency, and thereby to permit informed
16 public comment on proposed action and any choices or alternatives that might be pursued
17 with less environmental harm."). "[D]etermining what measures are needed through
18 extensive fact intensive inquiry is precisely the purpose of the long term environmental
19 review ordered by [the Court]." Idaho Watersheds Project, 307 F.3d at 83. As the Ninth
20 Circuit has observed,

21    it would be odd to require the district court to conduct an extensive inquiry,
    which would by nature involve scientific determinations, in order to support
22    interim measures that are designed to temporarily protect the environment
    while the [government] conducts studies in order to make the very same
23    scientific determinations.

24 Id. Yet, defendants ask the Court to now conduct--based on a limited record--the very same
25 scientific inquiry it ordered APHIS to do as part of the EIS process.

26    APHIS contends, in essence, that it can grant Monsanto's deregulation petition
27 without preparation of an EIS as long as it imposes certain conditions on the introduction of
28 the genetically-engineered crop. For example, APHIS's Director of Environmental Risk

United States District Court
For the Northern District of California

7

1 Analysis Division represents that APHIS "is fully committed to preparing a comprehensive
2 environmental impact statement (EIS) prior to deciding in the future whether [Roundup
3 Ready Alfalfa] should be *unconditionally* deregulated." Second Declaration of Neil Hoffman
4 (March 7, 2007) ¶ 2 (emphasis added). Hoffman's carefully chosen words reveal that APHIS
5 is *not* committed to preparing an EIS before it conditionally deregulates Roundup Ready
6 alfalfa, which is what it is attempting to do with its proposed permanent relief.

7 The Court rejects APHIS's cramped reading of this Court's Order and NEPA.
8 APHIS's decision on Monsanto's deregulation petition is the major federal action requiring
9 the preparation of an EIS; APHIS does not need to prepare an EIS only if it ultimately
10 decides to *unconditionally* deregulate the genetically engineered crop. As the Court found in
11 its NEPA Order, it is the significant threat of gene flow and the development of Roundup-
12 resistant weeds that requires further study and analysis in an EIS so that APHIS can decide if
13 deregulation is appropriate and, if so, under what, if any, conditions. NEPA Order at 10.
14 The Court never suggested that APHIS could skip the EIS process and decide without any
15 public comment that deregulation with certain conditions is appropriate.

16 In any event, defendants' analysis is still inadequate. They have not submitted any
17 evidence that suggests whether, and to what extent, the proposed interim conditions will be
18 followed, even though such conditions are similar to those already imposed by Forage
19 Genetics in its contracts with Roundup Ready seed growers and contamination has occurred
20 despite those conditions. Defendants simply respond that the government has the authority to
21 enforce the conditions, but having the authority and effectively using the authority are two
22 different matters: the government has the authority to enforce the immigration laws, but
23 unlawful entry into the United States still occurs. Moreover, APHIS asserts that it does not
24 have the resources to inspect the 220,000 acres currently planted with Roundup Ready alfalfa
25 hay. Second Declaration of Neil Hoffman (March 7, 2007) at ¶ 3. It does not explain how it
26 expects to have the resources to adequately monitor the more than one million acres of
27 Roundup Ready alfalfa hay intervenors estimate will be planted, and the concomitant
28 increase in seed acreage, if, as they urge, the Court does not prohibit future plantings.

United States District Court
For the Northern District of California

8

United States District Court
For the Northern District of California

Another example of the continued inadequacy of defendants' analysis is their contention that requiring growers to harvest their crops before seed sets or before ten percent bloom will virtually eliminate any chance of contamination. In its NEPA Order the Court noted that the government had "failed to consider . . . that because of weather–which is beyond a farmer's control–a farmer cannot always harvest his field at the most optimal time." NEPA Order at 10. APHIS has still not made any inquiry (that it has shared with the Court) into "how often farmers are actually able to harvest their forage crop before seeds mature and no inquiry into the likelihood of gene transmission when they cannot." Id. Indeed, at oral argument on the preliminary injunction, the Court asked Mark McCaslin, the President of Forage Genetics, whether the Court should enter an order requiring harvest at a certain point to reduce the likelihood of gene flow. Mr. McCaslin candidly responded: "In the midwest where there is no seed production, that would be a disaster because there is–the challenge in the midwest is usually harvesting around the weather." March 8, 2007 Transcript at 27.

With this context in mind, the Court finds that plaintiffs have sufficiently established irreparable injury and that the balance of the equities weighs in favor of maintenance of the status quo and against allowing the continued expansion of the Roundup Ready alfalfa market pending the government's completion of the EIS. As the Court explained in its NEPA Order, contamination of organic and conventional alfalfa crops with the genetically engineered gene has occurred and defendants acknowledge as much. Such contamination is irreparable environmental harm. The contamination cannot be undone; it will destroy the crops of those farmers who do not sell genetically engineered alfalfa. Moreover, it is not a one season loss; alfalfa is a perennial crop and once removed cannot be replanted for two to four years. Mark McCaslin March 23, 2007 Direct Testimony at 6.

The harm to these farmers and consumers who do not want to purchase genetically engineered alfalfa or animals fed with such alfalfa outweighs the economic harm to Monsanto, Forage Genetics and those farmers who desire to switch to Roundup Ready alfalfa. Roundup Ready alfalfa is only 15 percent of Forage Genetics' total revenue and much, much less of Monsanto's. Moreover, intervenors do not contend that the harvested but

9

unsold seed cannot be stored until–and if–APHIS decides to deregulate Roundup Ready alfalfa after conducting an objective and thorough environmental analysis. The loss of anticipated revenue to Monsanto and Forage Genetics in the meantime "does not outweigh the potential irreparable damage to the environment." National Park & Conservation Ass'n., 241 F.3d at 738. Moreover, neither Monsanto nor Forage Genetics "have cause to claim surprise as a result of any injunction." Id. They were aware of plaintiffs' objections to the deregulation decision at the time it was made and were aware of plaintiffs' lawsuit; they nonetheless chose to market Roundup Ready alfalfa.

The desire of some farmers to plant *more* Roundup Ready alfalfa or to *switch to* Roundup Ready alfalfa, that is, to do something different from what they have done in the past, similarly does not outweigh the potential for irreparable harm. And if these farmers were not aware of the plaintiffs' challenge to Roundup Ready alfalfa, that is a matter to raise with Monsanto and Forage Genetics. See National Park & Conservation Ass'n., 241 F.3d at 738 (noting that cruise ship passengers who were not warned by carrier of lawsuit challenging cruises "were not well served by that company").

Allowing an expansion of the Roundup Ready alfalfa market pending the preparation of the EIS would be unprecedented. None of the cases cited by defendants allowed for an *increase* in the activity that posed the risk to environment. In Idaho Watersheds Project, for example, the district court found that the Bureau of Land Management had violated NEPA by issuing permits for cattle grazing without preparing the required environmental documentation. The district court considered and rejected a complete halt to all grazing, concluding that such a remedy would be too drastic. Id. at 833. Instead, the court allowed the previously-permitted grazing to continue pending the BLM's completion of its environmental review, subject to certain conditions designed to mitigate the harm from the continued grazing. Id. The court did not, however, allow the BLM to issue additional permits, which is essentially what defendants ask for here. The "middle ground" taken by the court in Idaho Watersheds is the approach taken here: as will be discussed below, the Court is not requiring those farmers who have already planted Roundup Ready alfalfa to

10

1   destroy their crops; instead, the Court is prohibiting the introduction of any new Roundup
2   Ready crops.

3       In High Sierra Hikers Association, another case cited by defendants, the court held
4   that the government violated NEPA by issuing multi-year special-use permits to commercial
5   outfitters and guides in the John Muir and Ansel Adams wilderness areas without first
6   preparing and EIS. 390 F.3d at 640-41. The court did not require the permitted packers to
7   cease operations; instead, the court crafted a remedy that allowed for the continued
8   operations of the packers, provided the current levels of use were reduced by 20 percent. Id.
9   at 642-43. Again, the court did not allow for the packers' operations to increase–or for new
10  permits to be issued; to the contrary, the court reduced the level of commercial pack
11  operations. Here, in contrast, defendants seek to *dramatically increase the amount of acres*
12  *planted with Roundup Ready alfalfa* even though the Court has ruled that the government
13  should have prepared an EIS before allowing the plantings in the first place. See also Sierra
14  Club v. Penfold, 857 F.2d 1307, 1316-17 (9th Cir. 1988) (allowing mining operations begun
15  prior to court's finding of NEPA violation to be completed, but prohibiting any additional
16  mining operations); Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152, 1154-55, 1157-58
17  (9th Cir. 1988) (after finding that government awarded mining leases three years earlier in
18  violation of NEPA, the district court suspended the mining operations in all but two of the
19  mines; the Ninth Circuit held that the district court had discretion to balance the equities to
20  allow the mining operations to continue, although it had done so on an inadequate record, but
21  the court did not allow for an increase in mining); Westlands Water Dist. v. U.S. Dept. of
22  Interior, 275 F.Supp.2d 1157 (E.D. Cal. 2002) (enjoining part of project, but allowing part of
23  project to continue in light of a congressional mandate; court did not allow for an increase in
24  the project pending completion of the environmental review); Wilderness Watch v. U.S.
25  Forest Service, 143 F.Supp.2d 1186 (D. Mont. 2000) (court refused to order the destruction
26  of wilderness lodge built without the required environmental assessments; court did not allow
27  for the future construction of lodges while the environmental review was pending).

28

United States District Court
For the Northern District of California

11

1    Finally, the Court rejects defendants' assertion that allowing an expansion in the
2  Roundup Ready alfalfa market is in the public interest because it promotes the use of less
3  toxic herbicides. The record reflects that organic and most conventional forage alfalfa is
4  grown without the use of any herbicides. In any event, a finding that increasing the use of
5  Roundup is in the public interest is premature in light of APHIS's failure to analyze the
6  potential for the development of Roundup-resistant weeds. Moreover, it is not in the public
7  interest to take action that has the potential of eliminating the availability of a non-genetically
8  engineered crop without adequate investigation into the long term impact of such action;
9  rather, the Court finds that it is in the public interest to delay the further introduction of
10  Roundup Ready alfalfa into the environment while APHIS studies the environmental
11  consequences of such action.

12    In sum, after balancing all of the equities, the Court in its discretion finds that an
13  injunction maintaining the status quo by prohibiting the planting of Roundup Ready alfalfa
14  after March 30, 2007 is appropriate. The Court cautions that it does not intend its injunction
15  to apply to plantings of Roundup Ready alfalfa as a regulated article under permit from
16  APHIS. While some lawsuits have challenged APHIS's permitting process for regulated
17  articles, see, e.g., Int'l Center for Technology Assessment v. Johanns, 473 F.Supp.2d 9
18  (D.D.C. 2007), this lawsuit challenges APHIS's action on Monsanto's deregulation petition.
19  And plaintiffs have not established that APHIS will avoid the import of this Court's
20  injunction by abusing the permit process. APHIS has represented under oath that its current
21  permitting process is designed to regulate small scale field tests and that it does not have the
22  resources to provide permits for and adequately monitor large acreage of Roundup Ready
23  alfalfa. Second Declaration of Neil Hoffman (March 7, 2007) ¶ 3.

24  **B.    Already Planted Roundup Ready Alfalfa**

25    As the Court noted in its preliminary injunction order, some growers have already
26  planted Roundup Ready alfalfa in reliance on the federal defendants' June 2005 deregulation
27  decision. Plaintiffs do not seek to enjoin such forage alfalfa from being grown, harvested
28  and sold, and the Court agrees that such a remedy would be too drastic, especially in light of

United States District Court
For the Northern District of California

12

1   the Court's order capping the number of acres of Roundup Ready alfalfa. <u>See Seattle</u>

2   <u>Audubon Soc'y v. Evans</u>, 771 F.Supp. 1081, 1087-95 (W.D. Wash. 1991) (taking logging

3   industry interests into account in conducting equitable balancing for environmental law

4   violation, resulting in injunction of future timber sales, but not existing sales), <u>aff'd</u>, 952 F.2d

5   297, 298 (9th Cir. 1991).

6        Plaintiffs do seek to enjoin the harvesting and sale of already planted Roundup Ready

7   alfalfa seed. They contend that the risk of contamination from the mixing of the genetically-

8   engineered seed with non-engineered seed outweighs any harm to those farmers with

9   contracts with Forage Genetics to produce such seeds. The Court declines to impose such an

10   order and interfere with the contracts entered into by these farmers. The record reflects that

11   Forage Genetics has contracts with 76 farmers to grow Roundup Ready alfalfa seed. The

12   financial burden to these farmers of an injunction preventing them from fulfilling their

13   contracts outweighs the harm to the human environment in these limited circumstances. <u>See</u>

14   <u>Amoco Production Co. v. Gambell</u>, 480 U.S. 531, 541, 544-45 (1987) (noting, in

15   summarizing Ninth Circuit law, that "unusual circumstances" weighing against injunctive

16   relief include "those in which an injunction would interfere with a long-term contractual

17   relationship"); <u>Sierra Club</u>, 857 F.2d at 1316-17 (allowing mining operations begun prior to

18   court's finding of NEPA violation to be completed, but prohibiting any additional mining

19   operations).

20        The Court will impose certain conditions in an attempt to minimize the risk of gene

21   flow from the already-planted genetically engineered alfalfa to organic and conventional

22   alfalfa. As the alfalfa has already been planted, the Court will not impose isolation distances;

23   however, the Court will adopt the relevant conditions proposed by APHIS. In particular,

24   within 45 days of the date of this Order, APHIS shall issue an administrative order imposing

25   the following requirements:

26        I.    Pollinators shall not be added to Roundup Ready alfalfa fields grown only for

27              hay production.

28

13

II. Farm equipment used in Roundup Ready alfalfa production shall be properly cleaned after use.

    A. Cleaning procedures for harvesters, tractors and tillage equipment shall be submitted to and approved by APHIS prior to implementation.

    B. Cleaning procedures shall be designed to minimize the risk of Roundup Ready alfalfa seed and hay movement from authorized production site.

    C. All equipment shall be cleaned in accordance with the approved procedures before it leaves the farm on which in came in contact with Roundup Ready alfalfa.

III. Roundup Ready alfalfa shall be handled and clearly identified to minimize commingling after harvest. Immediately after harvest, growers or seed producers shall store Roundup Ready alfalfa in specifically designated and clearly labeled containers.

As all Roundup Ready seed growers are under contract with Forage Genetics, and as all Roundup Ready alfalfa farmers have a license with Monsanto, Monsanto, Forage Genetics and APHIS shall work together to ensure that all Roundup Ready alfalfa farmers are aware of the above requirements.

It is also important that the organic and conventional alfalfa farmers learn where Roundup Ready alfalfa is grown so that they can test their own crops to determine if there has been contamination. Forage Genetics maintains GPS or plat mats identifying the location of all alfalfa seed production acreage. Mark McCaslin March 23 Direct Testimony at 9. Forage Genetics also requires growers who purchase Roundup Ready alfalfa in 17 Western states to provide field size and GPS locations at the time of purchase "to enable monitoring and enforcement of the Monsanto trait stewardship measures." Id. at 16. Within 30 days of the judgment, Forage Genetics shall provide the above identifying information to APHIS and APHIS shall make such information publicly available as soon as practicable, including, but not limited to, making such information available on the appropriate government website. Forage Genetics shall also use its best efforts to obtain field size and GPS locations of

14

1  Roundup Ready alfalfa in the remaining states and provide such information to APHIS for
2  public disclosure.

3                              **CONCLUSION**

4        For the reasons explained above, the intervenors' motion for reconsideration of the
5  preliminary injunction order is DENIED. The Court will enter a final judgment (1) vacating
6  the June 2005 deregulation decision; (2) ordering the government to prepare an EIS before it
7  makes a decision on Monsanto's deregulation petition; (3) enjoining the planting of any
8  Roundup Ready alfalfa in the United States after March 30, 2007 pending the government's
9  completion of the EIS and decision on the deregulation petition; and (4) imposing the above
10  conditions on the handling and identification of already-planted Roundup Ready alfalfa.

11       The parties shall jointly submit a written status report within 60 days of the date of
12  this Order to update the Court on defendants' compliance with the injunction.

13       **IT IS SO ORDERED.**

14  Dated: May 3, 2007
15                                          CHARLES R. BREYER
                                            UNITED STATES DISTRICT JUDGE
16
17
18
19
20
21
22
23
24
25
26
27
28

G:\CRBALL\2006\1075\orderrepermanentrelief.wpd

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GEERTSON SEED FARMS, et al.,

        Plaintiffs,

  v.

MIKE JOHANNS, Secretary of the United
States Department of Agriculture, et al.,

        Defendants.

No. C 06-01075 CRB

**MEMORANDUM AND ORDER**

    In this lawsuit plaintiff alfalfa growers along with the Sierra Club and other farmer and consumer associations challenge the Department of Agriculture's decision to deregulate alfalfa genetically engineered to resist the herbicide glyphosate, the active ingredient in RoundUp ("Roundup Ready alfalfa"). Plaintiffs bring their claims pursuant to the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Plant Protection Act ("PPA"). Now pending before the Court are the parties' cross-motions for summary judgment. The motions raise a close question of first impression: whether the introduction of a genetically engineered crop that might significantly decrease the availability or even eliminate all non-genetically engineered varieties is a "significant environmental impact" requiring the preparation of an environmental impact statement, at least when it involves the fourth largest crop in the United States.

1

## BACKGROUND

2      The federal Plant Protection Act gives the Secretary of the United States Department

3 of Agriculture ("USDA") the authority to adopt regulations preventing the introduction and

4 dissemination of plant pests. 7 U.S.C. § 7711(a); Center for Food Safety v. Johanns, 451

5 F.Supp.2d 1165, 1176 (D. Haw. 2006). Pursuant to this authority, the USDA, through the

6 Animal and Plant Health Inspection Service ("APHIS"), regulates "organisms and products

7 altered or produced through genetic engineering that are plant pests or are believed

8 to be plant pests." 7 C.F.R. § 340.0(a)(2) n.1. Such products/organisms are known as

9 "regulated articles." APHIS originally considered Roundup Ready alfalfa a regulated article;

10 as such, it was unlawful for any person to introduce the alfalfa without first obtaining

11 permission from APHIS. Id.

12      Any person may submit a petition seeking a determination that a regulated article does

13 not present a plant pest risk and therefore should not be regulated. 7 C.F.R. § 340.6. In May

14 2003, Monsanto, the manufacturer of Roundup, submitted a petition requesting nonregulated

15 status for Roundup Ready alfalfa, designated as event J101 and J163. Administrative Record

16 ("AR") 5482. Roundup Ready alfalfa is engineered to be glyphosate-tolerant by inserting a

17 gene that codes for the enzyme 5-enolpyruvylshikimate-3-phosphate synthase into the alfalfa

18 genome. AR 5501.

19      APHIS had several possible responses: it could approve the petition in whole, approve

20 the petition in part, or deny the petition. AR 5503. If it denied the petition, commercial-

21 scale production of Roundup Ready alfalfa would continue to be precluded, although the

22 plant could still be grown in field trials, as it has since 1998. AR 5503. APHIS could also

23 determine that Roundup Ready alfalfa poses no significant risk in certain geographic areas,

24 but a significant risk in others, and therefore approve the petition in part; that is, approve the

25 petition with a geographic limitation on where the genetically engineered alfalfa could be

26 grown. AR 5504. Finally, APHIS could approve the petition in whole, which means that

27 Roundup Ready alfalfa would no longer be subject to USDA regulation. AR 5505.

28

United States District Court
For the Northern District of California

1    Before deciding Monsanto's petition, APHIS prepared an Environmental Assessment
2  ("EA") and took public comments on the EA and the petition for deregulation. Of the 663
3  comments received by the agency, 520 opposed deregulation. AR 5487.

4    One of the primary objections raised is that gene transmission may occur between
5  glyphosate tolerant alfalfa and conventional and organic alfalfa, that is, that conventional and
6  organic alfalfa will become "contaminated" with the engineered gene that makes Roundup
7  Ready alfalfa tolerant to glyphosate. Such gene transmission is possible because alfalfa is
8  pollinated by bees "and so the potential exists to move pollen from the glyphosate tolerant
9  crop to hay and seed fields, as well as wild populations of alfalfa." AR 5488. Indeed, it is
10  undisputed that insect pollination for alfalfa can occur up to at least two miles from the
11  pollen source. Id. Farmers complained to APHIS that if Roundup Ready alfalfa is
12  deregulated they will no longer be able to market their products as "organic," or at least as
13  non-genetically engineered, and that this "contamination" will also impact those who sell
14  organic livestock or livestock that is not fed any genetically engineered foods. AR 5488,
15  5491, 5495. In addition, 75 percent of the alfalfa exported from the United States (five
16  percent of the alfalfa market) is exported to Japan and Japan does not permit the import of
17  glyphosate tolerant alfalfa; thus, the introduction of Roundup Ready alfalfa might also
18  impact the export market. AR 5487.

19    Commentators also expressed concern that the deregulation of Roundup Ready alfalfa,
20  and the concomittant increase in the use of Roundup, will cause the development of
21  additional glyphosate-resistant weeds, as well as a dramatic increase in the amount of
22  Roundup used in the environment.

23    Nonetheless, in June 2005, APHIS issued a Finding of No Significant Impact
24  ("FONSI") and approved Monsanto's deregulation petition in whole; that is, the agency
25  concluded that Roundup Ready alfalfa should be deregulated and sold without direct
26  regulation by the USDA. AR 5485-5526.

27    The FONSI acknowledges that once Roundup Ready alfalfa is deregulated, it will not
28  be subject to any "isolation distances;" that is, it will not be required to be grown more than

3

1 two miles from conventional or organic alfalfa crops. AR 5488; see also AR 5495 ("If
2 APHIS grants non-regulated status to a transgenic events, APHIS does not have any further
3 regulatory authority over this particular transgenic event"). APHIS nevertheless concluded
4 that the risk of gene transmission is not significant because "organic production operations
5 must develop and maintain an organic production system plan that outlines the steps it will
6 take to avoid cross pollination from neighboring operations." AR 5488. In other words, it
7 would be "up to the individual organic seed or hay grower to institute those procedures that
8 will assure" that their crops will not include any genetically engineered alfalfa. AR 5491.
9 APHIS also noted that the states would still have the authority to establish some type of
10 production zone. AR 5495. As for exports to Japan, APHIS concluded, without elaboration,
11 that "[b]y employing reasonable quality control, it is highly unlikely that the level of
12 glyphosate tolerant alfalfa will exceed 1% in conventional alfalfa hay" and that since Japan
13 allows one percent of exports of a crop to contain genetically modified product, exports to
14 Japan would not be affected. AR 5488.

15 In the EA, APHIS concluded that organic farmers and farmers who otherwise do not
16 want to grow genetically engineered alfalfa will not be significantly impacted by the
17 commercial use of Roundup Ready alfalfa because (1) non-genetically engineered alfalfa will
18 "likely still be sold and available to those who wish to plant it;" and (2) farmers purchasing
19 seed will know what they are purchasing because the seed will be labeled as glyphosate
20 tolerant. AR 5511.

21 APHIS agreed with the objectors that the deregulation of Roundup Ready alfalfa
22 could lead to the development of additional glyphosate-resistant weeds, but reasoned that this
23 impact was not significant because weed species have developed resistance to every widely
24 used herbicide; alternative herbicides are available to minimize the problem; and, in any
25 event, "good stewardship may be the only defense against this potential problem." AR 5492.

26 Plaintiffs now challenge APHIS's decision to deregulate Roundup Ready alfalfa.

4

1

## DISCUSSION

2 **I.  NEPA**

3       NEPA "requires a federal agency such as [APHIS] to prepare a detailed EIS for all

4   'major Federal actions significantly affecting the quality of the human environment.'" Blue

5   Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211-12 (9th Cir. 1998)

6   (quoting 42 U.S.C. § 4332(2)(C)). "NEPA ensures that the agency . . . will have available,

7   and will carefully consider, detailed information concerning significant environmental

8   impacts; it also guarantees that the relevant information will be made available to the larger

9   [public] audience." Id. (internal quotation marks and citation omitted).

10       Accordingly, "[a] threshold question in a NEPA case is whether a proposed project

11   will 'significantly affect' the environment, thereby triggering the requirement for an EIS."

12   Id. "Where an EIS is not categorically required, the agency must prepare an Environmental

13   Assessment to determine whether the environmental impact is significant enough to warrant

14   an EIS." Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 863 (9th Cir.

15   2005). "An EA is a concise public document that briefly provide[s] sufficient evidence and

16   analysis for determining whether to prepare an EIS or a finding of no significant impact."

17   Blue Mountains Biodiversity Project, 161 F.3d at 1212.

18       Here, APHIS prepared an EA and, after receiving public comment, issued a finding of

19   no significant impact and approved the deregulation of Roundup Ready alfalfa. See

20   Anderson v. Evans, 371 F.3d 475, 488 (9th Cir. 2004) (if an EA results in a "finding of no

21   significant impact"--known as a FONSI--the agency need not prepare an environmental

22   impact statement). Plaintiffs contend that APHIS is required to prepare an EIS.

23       **A.    Standard of Review**

24       The Court must determine whether APHIS's "decision was based on consideration of

25   the relevant factors, or whether its actions were arbitrary, capricious, an abuse of discretion

26   or otherwise not in accordance with the law." Blue Mountains Biodiversity Project, 161 F.3d

27   at 1211 (internal quotation marks and citation omitted). "In short, [the Court] must ensure

28   that the agency has taken a 'hard look' at the environmental consequences of its proposed

United States District Court
For the Northern District of California

5

1 action." Id. "A hard look includes considering all foreseeable direct and indirect impacts.'"

2 Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1159 (9th Cir. 2006) (internal

3 quotation marks and citation omitted). "An agency's decision not to prepare an EIS will be

4 considered unreasonable if the agency fails to supply a convincing statement of reasons why

5 potential effects are insignificant." Blue Mountains Biodiversity Project, 161 F.3d at 1211

6 (internal quotation marks and citation omitted); see also Ocean Advocates, 402 F.3d at 865

7 ("[T]he agency must put forth a 'convincing statement' of reasons that explain why the

8 [agency action] will impact the environment no more than insignificantly"). "The statement

9 of reasons is crucial to determining whether the agency took a 'hard look' at the potential

10 environmental impact of a project." Blue Mountains Biodiversity Project, 161 F.3d at 1212

11 (internal quotation marks and citation omitted).

12     **B.**   **Analysis**

13     "[A]n EIS *must* be prepared if 'substantial questions are raised as to whether a project

14 *may* cause significant degradation of some human environmental factor.'" Idaho Sporting

15 Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting Greenpeace Action v.

16 Franklin, 14 F.3d 1324, 1332 (9th Cir. 1992)). "Thus to prevail on a claim that [APHIS]

17 violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects

18 will in fact occur. It is enough for the plaintiff to raise substantial questions whether a

19 project may have a significant effect on the environment." Blue Mountains Biodiversity

20 Project, 161 F.3d at 1212 (internal quotation marks and citation omitted). "Put another way,

21 a proposal can be considered controversial if substantial questions are raised as to whether a

22 project may cause significant degradation of some human environmental factor." Anderson,

23 371 F.3d at 489.

24     "In determining whether a federal action requires an EIS because it significantly

25 affects the quality of the human environment, an agency must consider what 'significantly'

26 means." Ocean Advocates, 402 F.3d at 865. "Significantly," has two components: context

27 and intensity. Id. (citing 40 C.F.R. § 1508.27). "Context refers to the setting in which the

28 proposed action take place." Id. (citing 40 C.F.R. § 1508.27(a)). "Intensity means 'the

*United States District Court*
*For the Northern District of California*

6

1 severity of the impact.'" Id. (citing 40 C.F.R. § 1508.27(b)).

2     Several factors must be considered in evaluating intensity, including the "degree to
3 which the effects on the quality of the human environment are likely to be highly
4 controversial;" "[t]he degree to which the possible effects on the human environment are
5 highly uncertain or involve unique or unknown risks;" and "[t]he degree to which the
6 proposed action affects public health and safety." 40 C.F.R. § 1508.27(b)(2), (4), (6).

7     The context of the inquiry in this case is undisputed. Alfalfa is the fourth most widely
8 grown crop in the United States. The bulk of alfalfa seed (as opposed to alfalfa forage) is
9 grown in limited geographic areas within a few states. California is the largest producer of
10 alfalfa seed, and California, Idaho, Washington and Nevada together produce 85 percent of
11 all domestic alfalfa seed. In this context, plaintiffs identify what they believe are several
12 significant environmental impacts that will be caused by Roundup Ready alfalfa, or that at
13 least may be caused by the deregulation of the genetically engineered alfalfa.

14         **1. Gene transmission to non-genetically engineered alfalfa**

15     Plaintiffs contend that one significant environmental impact resulting from the
16 introduction of Roundup Ready alfalfa is that genetically engineered alfalfa will modify non-
17 genetically engineered alfalfa such that it, too, will contain the gene that confers tolerance to
18 the herbicide glyphosate. Plaintiffs label such effect "biological contamination." Biological
19 contamination can occur through pollination of non-genetically engineered plants by
20 genetically engineered plants or by the mixing of genetically engineered seed with natural, or
21 non-genetically engineered seed.

22     Alfalfa seeds are pollinated by bees and, as a result, there is a realistic potential for
23 contamination from seed fields to nearby seed fields; indeed, APHIS admits that insects
24 pollinate alfalfa up to two miles from the pollen source. AR 5488. Such gene transmission
25 is especially likely in this context given the geographic concentration of alfalfa seed
26 production. Once the gene transmission occurs and a farmer's seed crop is contaminated
27 with the Roundup Ready gene, there is no way for the farmer to remove the gene from the

28

United States District Court
For the Northern District of California

7

1   crop or control its further spread. AR 4287. And alfalfa is a perennial crop; the crop is only

2   replanted every three to four years.

3        Plaintiffs complain that the "contamination" of organic and conventional crops with

4   the genetically engineered gene will have negative economic and socioeconomic effects on

5   farmers. Organic farmers will no longer be able to market their seed as non-genetically

6   engineered, rendering their crops less valuable; consumers pay a premium for organic and

7   non-genetically engineered food. Similarly, organic livestock farmers will have a more

8   difficult time purchasing non-genetically engineered alfalfa as food for livestock and thus

9   will be unable to market their livestock as organic or at least fed with non-genetically

10   engineered food. All of these farmers may be required to test their crops and livestock for

11   traces of the genetically-engineered alfalfa. Even non-organic farmers who want to raise

12   genetically-engineered free plants and livestock will be impacted.

13        APHIS acknowledges that once Roundup Ready alfalfa is deregulated the government

14   will not be able to impose isolation distances on the growers of genetically engineered

15   alfalfa; in other words, it cannot ensure that farmers using the genetically engineered seed

16   will be more than two miles away from seed farmers who do not wish to grow engineered

17   alfalfa. AR 5488. APHIS nonetheless concluded that the introduction of Roundup Ready

18   alfalfa will have no significant environmental impact, reasoning as follows:

19      [T]he National Organic Program, which is administered by USDA's
       Agricultural Marketing Service, requires organic production operations to have
20     distinct, defined boundaries and buffer zones to prevent unintended contact
       with prohibited substances, such as modified genes, from adjoining land that is
21     not under organic management. However, the determination of the size of the
       buffer zones is left up to the organic producer and the certifying agent on a
22     case-by-case basis. Furthermore, organic production operations must develop
       and maintain an organic production system plan that outlines the steps it will
23     take to avoid cross pollination from neighboring operations.

24   AR 5488, 5510. It also reasoned that federal organic standards do not require the testing of

25   inputs or products for genetically engineered genes and that the unintentional presence of the

26   engineered genes will not "necessarily" constitute a violation of national organic standards.

27   AR 5511.

28

United States District Court
For the Northern District of California

1    In the EA, APHIS concluded, without further elaboration, that non-genetically

2 engineered alfalfa seed "will likely still be sold and will be available to those who wish to

3 plant it," and that genetically engineered seed will be marketed and labeled as glyphosate

4 tolerant so farmers will know when they are purchasing Roundup Ready alfalfa seed. AR

5 5511. APHIS also found that gene transmission is not likely to occur with forage as opposed

6 to seed crops because forage fields are typically harvested before the seed is set and allowed

7 to mature. Id.

8    APHIS's reasons for concluding that the potential for the transmission of the

9 genetically engineered gene is not significant are not "convincing" and do not demonstrate

10 the "hard look" that NEPA requires. See Blue Mountains Biodiversity Project, 161 F.3d at

11 1211. APHIS did not conclude that gene transmission would not occur; indeed, an internal

12 APHIS email acknowledges that "[i]t may be hard to guarantee that seeds or sprouts are GE

13 free." AR 2816. Instead, it in effect concluded that whatever the likelihood of gene

14 transmission, such impact is not significant because it is the organic and conventional

15 farmers' responsibility to ensure that such contamination does not occur. It rested its "no

16 significant impact" decision on this conclusion even though it made no inquiry into whether

17 those farmers who do not want to grow genetically engineered alfalfa can, in fact, protect

18 their crops from contamination, especially given the high geographic concentration of seed

19 farms and the fact that alfalfa is pollinated by bees that can travel more than two miles.

20 Neither the EA nor the FONSI identify a single method that an organic farmer can employ to

21 protect his crop from being pollinated by a bee that travels from a nearby genetically

22 engineered seed farm, even assuming the farmer maintains a "buffer zone."

23    "Preparation of an EIS is mandatory where uncertainty may be resolved by further

24 collection of data, or where the collection of data may prevent speculation on potential . . .

25 effects. The purpose of an EIS is to obviate the need for speculation by insuring that

26 available data are gathered and implemented prior to the proposed action." National Parks

27 Conservation Ass'n v. Babbitt, 241 F.3d 722, 732 (9th Cir. 2001) (internal quotation marks

28 and citation omitted). The further collection of data can inform APHIS as to the likely extent

9

1    of any gene transmission and the realistic measures, if any, that may be taken to prevent or at
2    least reduce such contamination. Such data is especially important given that one option
3    APHIS has is to approve Monsanto's "petition with a geographic limitation stipulating that
4    the Roundup Ready could only be grown without APHIS authorization in certain geographic
5    areas." AR 5504. APHIS's rejection of this option without making any inquiry into the
6    extent of likely gene transmission from genetically engineered seed crops to non-engineered
7    seed crops is arbitrary and capricious; it did not obtain the very information it needs to
8    determine if such an option is warranted. See Earth Island Institute, 442 F.3d at 1160 ("If an
9    agency has failed to make a reasoned decision based on an evaluation of the evidence, [a
10   court] may properly conclude that the agency has acted arbitrarily and capriciously.");
11   Foundation for N. Am. Wild Sheep v. U.S. Dep't of Agr., 681 F.2d 1172, 1178 (9th Cir.
12   1982) (holding that agency violated NEPA when its EA "failed to address certain crucial
13   factors, consideration of which was essential to a truly informed decision whether or not to
14   prepare an EIS").

15        APHIS's conclusion that forage alfalfa will not be contaminated is also arbitrary and
16   capricious. APHIS baldly concluded that such gene transmission is not likely because
17   farmers typically harvest alfalfa forage fields before the seed matures. APHIS failed to
18   consider, however, that because of weather--which is beyond a farmer's control--a farmer
19   cannot always harvest his field at the most optimal time. APHIS made no inquiry into how
20   often farmers are actually able to harvest their forage crop before seeds mature and no
21   inquiry into the likelihood of gene transmission when they cannot. Without such data,
22   APHIS's conclusion is arbitrary. See Earth Island Institute, 442 F.3d at 1159 ("A hard look
23   should involve a discussion of adverse impacts that does not improperly minimize negative
24   side effects").

25        APHIS's reasoning that farmers will not "necessarily" be prohibited from labeling
26   their products as organic is wholly inadequate. First, the statement itself is equivocal; even
27   APHIS is uncertain whether farmers can still label their products organic under the federal
28   government's organic standards. Second, many farmers and consumers have higher

United States District Court
For the Northern District of California

1 standards than what the federal government currently permits; to these farmers and
2 consumers organic means not genetically engineered, even if the farmer did not intend for his
3 crop to be so engineered. And, as APHIS acknowledges, many countries, including Japan,
4 do not allow for the importation of genetically engineered alfalfa regardless of what the
5 United States government permits. Third, and most importantly, APHIS's comment simply
6 ignores that these farmers do not want to grow or feed to their livestock genetically
7 engineered alfalfa, regardless of how such alfalfa can be marketed.

8 APHIS's assertion that exports to Japan will not be harmed because Japan allows one
9 percent of its imported alfalfa to be transgenic and "[b]y employing reasonable quality
10 control, it is highly unlikely that the level of glyphosate tolerant alfalfa will exceed 1% in
11 conventional alfalfa hay," AR 5488, is also not convincing. Neither the EA nor the FONSI
12 contain any reference to any material in support of APHIS's conclusion that gene
13 transmission is "highly unlikely" to occur with "reasonable quality control." APHIS does
14 not identify any "quality control" that will prevent gene transmission between neighboring
15 seed farms. It similarly does not identify any material to support its EA statement that non-
16 genetically engineered alfalfa will "likely still be sold and available to those who wish to
17 plant it." AR 5511. See Blue Mountains Biodiversity Project, 1161 F.3d at 1214 ("The EA
18 contains virtually no reference to any material in support of or in opposition to its
19 conclusions. That is where the Forest Service's defense of its position must be found").

20 APHIS argues in its brief that the extent of any gene transmission is, in any event,
21 irrelevant because NEPA requires an agency to consider physical environmental impacts, not
22 economic or financial impacts. APHIS overstates the law. To determine whether NEPA
23 requires an agency to consider a particular effect, courts must "look at the relationship
24 between that effect and the change in the physical environment caused by the major federal
25 action at issue." Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766,
26 773 (1983); see also San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,
27 449 F.3d 1016, 1029 (9th Cir. 2006) ("[T]he essential analysis must focus on the closeness of
28 the relationship between the change in the environment and the 'effect' at issue") (internal

11

quotation marks and citation omitted); Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 943 (9th Cir. 2005) ("NEPA does not require an agency to assess all impacts of a project, only those that have a 'reasonably close causal relationship' with 'a change in the physical environment"). Economic effects are relevant "when they are '*interelated*' with 'natural or physical environmental effects.'" Ashley Creek Phosphate Co., 420 F.3d at 944 (quoting 40 C.F.R. § 1508.14 ("[E]conomic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment")).

Here, the economic effects on the organic and conventional farmers of the government's deregulation decision are interrelated with, and, indeed, a direct result of, the effect on the physical environment; namely, the alteration of a plant specie's DNA through the transmission of the genetically engineered gene to organic and conventional alfalfa. APHIS was required to consider those effects in assessing whether the impact of its proposed action is "significant." And, in fact, APHIS did mention those effects in the FONSI and EA, but, as explained above, its reasons for concluding that the effect on organic and conventional farmers is not significant are not "convincing."

Finally, the government argues that even if the deregulation of Roundup Ready alfalfa could result in the elimination of all non-genetically engineered alfalfa--in other words, there would be no alfalfa grown in the United States that does not contain the engineered gene that confers tolerance to glyphosate--such a result would still not constitute a significant environmental impact because APHIS has determined that the introduction of that gene to alfalfa is harmless to humans and livestock, that is, it is not toxic or pathogenic. Draft Transcript of January 19, 2007 Hearing at 54-55. APHIS's position is based on its finding that the engineered gene is similar to another gene already present in non-engineered alfalfa and is the equivalent to a natural enzyme found in both green plants and microorganims that are common in nature. AR 5482, 5483, 5490-91, 5501-5502, 5491. In sum, APHIS

12

1  concluded that the engineered enzyme is equivalent in all biological respects to those that are
2  common and harmless in nature and therefore the introduction of that engineered gene into
3  conventional or organic alfalfa is not a significant environmental impact as a matter of law.

4  The Court accepts, as it must, the agency's determination that Roundup Ready alfalfa
5  does not have any harmful health effects on humans or lifestock. See Natural Res. Defense
6  Council, Inc. v. EPA, 863 F.2d 1420, 1430 (9th Cir. 1988) ("A reviewing court should be at
7  its most deferential in reviewing an agency's scientific determinations in an area within the
8  agency's expertise"). Public health and safety, however, is only *one* of factors that an
9  agency should consider when determining whether a major federal action may have a
10  significant environmental impact. 40 C.F.R. § 1508.27(b). The government does not cite
11  any case, and the Court is aware of none, which holds that an impact is not significant simply
12  because a federal agency determines that the major federal action does not jeopardize the
13  public's health and safety. The paucity of caselaw is unsurprising given that one of
14  Congress's express goals in adopting NEPA was to "attain the widest range of beneficial
15  uses of the environment without degradation, risk to health and safety, *or other undesirable*
16  *and unintended consequences.*" 42 U.S.C. § 4331(b)(3) (emphasis added). A federal action
17  that eliminates a farmer's choice to grow non-genetically engineered crops, or a consumer's
18  choice to eat non-genetically engineered food, is an undesirable consequence: another NEPA
19  goal is to "maintain, wherever possible, an environment which supports diversity and variety
20  of individual choice." 42 U.S.C. § 4331(b)(4).

21  To put it another way, if the government's action could eliminate all alfalfa, there
22  would be no dispute that such action has a significant environmental impact, even though the
23  primary impact is the economic effect on alfalfa and livestock farmers. For those farmers
24  who choose to grow non-genetically engineered alfalfa, the possibility that their crops will be
25  infected with the engineered gene is tantamount to the elimination of all alfalfa; they cannot
26  grow their chosen crop. The government's apparent belief that the farmers' and consumers'
27  choice is irrational because the engineered gene is similar in all biological respects to a gene
28  found in nature (although never in alfalfa) is beside the point. An action which potentially

13

1  eliminates or least greatly reduces the availability of a particular plant--here, non-engineered
2  alfalfa--has a significant effect on the human environment. See 40 C.F.R. § 1508.27(b) ("A
3  significant effect may exist even if the Federal agency believes that on balance the effect will
4  be beneficial").

5  One other point bears mention. At oral argument the Court asked the government
6  why APHIS addressed (albeit inadequately) the economic impact on farmers if it is the
7  agency's position that, regardless of how much gene transmission occurs, such transmission
8  is insignificant because it is harmless. The government candidly explained that it addressed
9  these possible effects because Roundup Ready alfalfa is the first crop that has been
10  engineered to resist a herbicide "and in which the record suggests that there's at least a
11  chance that the [genetically engineered] gene could be transmitted." Draft Transcript of
12  January 19, 2007 Hearing at 53. The government's response highlights that APHIS is
13  operating in uncharted territory. In light of the Court's conclusion that the permanent
14  modification of a plant's genetic makeup through genetic engineering is an effect on the
15  human environment, and the evidence that such transmission can and will occur, and that
16  APHIS did not adequately analyze the extent of such transmission, the possible effects of
17  APHIS's deregulation decision are "highly uncertain or involve unique or unknown risks."
18  40 C.F.R. § 1508.27(5).

19  The Court cautions that it is not ruling that Roundup Ready alfalfa is harmful to
20  consumers or livestock. Rather, the significant impact that requires the preparation of an EIS
21  is the possibility that the deregulation of Roundup Ready alfalfa will degrade the human
22  environment by eliminating a farmer's choice to grow non-genetically engineered alfalfa and
23  a consumer's choice to consume such food.

24  **2.  The development of alfalfa weeds resistant to herbicides**

25  Plaintiffs also complain that the deregulation of Roundup Ready alfalfa will cause
26  Roundup-resistant weeds, and that such an effect is sufficiently significant to require the
27  preparation of an EIS. APHIS acknowledges that the use of Roundup Ready alfalfa may
28  result in the development of Roundup-tolerant weeds. AR 5492. The resistance develops

14

CRB Document 83 Filed 02/13/07 Page 15 of 20

because of the increased use of Roundup on the crops. APHIS found that such a possible impact nevertheless does not warrant the preparation of an EIS because weed species often develop resistance to herbicides and the agricultural community is addressing the issue. "Alternative herbicides and strategies are available that may minimize the problem. Based on the comments, the alfalfa growers and weed scientists understand that good stewardship may be the only defense against this potential problem." AR 5492

APHIS's reasons for finding the development of glyphosate resistant weeds not to be significant are not convincing. Reasoning that weed species often develop resistance to herbicides is tantamount to concluding that because this environmental impact has occurred in other contexts it cannot be significant. Nothing in NEPA, the relevant regulations, or the caselaw support such a cavalier response.

The assertion that "good stewardship" may be the only defense against such weeds is equally unconvincing. Such a conclusion is not the same as a finding that the development of the weeds is not a significant environmental impact. This is especially so given that neither the FONSI nor the EA contain any analysis as to what exactly constitutes good stewardship and how likely it is to be practiced successfully. See Blue Mountains Biodiversity Project, 161 F.3d at 1214. There may be ways to reduce the proliferation of weeds, but if farmers are not engaging (or cannot engage) in those practices, then the availability of those practices does not ameliorate the potential environmental impact.

Finally, APHIS failed to evaluate the cumulative impact of the deregulation of Roundup Ready alfalfa. 40 C.F.R. § 1508.7 ("'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.") . While alfalfa is the first large scale perennial Roundup Ready crop, APHIS has deregulated other Roundup Ready crops, including corn and soybeans, and other deregulation petitions are pending. While the deregulation of one crop in and of itself might not pose a significant

15

1 risk for the development of glyphosate resistant weeds, when all the crops are considered
2 cumulatively such a risk may become apparent. There is nothing in the FONSI or EA that
3 suggests APHIS even considered how much Roundup use will increase, or even how much
4 such use has increased since the introduction of the other Roundup Ready crops; to the
5 contrary, the EA specifically states that it "does not address the separate issue of the potential
6 use of the herbicide glyphosate in conjunction with these plants." AR 5501. APHIS's failure
7 to consider in the context of the development of Roundup resistant weeds that there are
8 already other Roundup Ready crops on the market, and more crops seeking to enter the
9 market, means that it did not take the "hard look" NEPA requires.

### 3. Increased use of glyphosate

11 In a related argument, plaintiffs assert that--even apart from the development of
12 glyphosate-resistant weeds--APHIS failed to consider that the deregulation of Roundup
13 Ready alfalfa will result in the increased use of Roundup, and likewise failed to consider how
14 that increased use of Roundup, perhaps doubling its use on alfalfa fields in California alone,
15 will impact the environment. And, argue plaintiffs, APHIS should have considered this
16 increased use in the context of its deregulation of other Roundup Ready crops; in other
17 words, APHIS must inquire whether the introduction of the many Roundup Ready crops will
18 together increase the use of Roundup and impact the environment.

19 APHIS responds that there are other federal agencies, primarily the Environmental
20 Protection Agency ("EPA"), that are responsible for regulating herbicides and tolerance
21 levels in crops for such chemicals. It also contends that there is no evidence that farmers will
22 misuse Roundup, that is, use it contrary to the manufacturer's instructions and it notes that
23 Roundup use will replace more toxic herbicides.

24 Since the Court has concluded that APHIS must consider the cumulative impact of
25 increased glyphosate use with respect to the development of glyphosate-resistant weeds,
26 APHIS will have to examine the increased use of glyphosate; thus, the Court declines to
27 specifically rule on this claim. The Court notes, however, that it is unclear from the record
28 whether any federal agency is considering the cumulative impact of the introduction of so

United States District Court
For the Northern District of California

1  many glyphosate resistant crops; one would expect that some federal agency is considering
2  whether there is some risk to engineering all of America's crops to include the gene that
3  confers resistance to glyphosate.

**C.  Standing**

5  The government contends that plaintiffs lack standing to bring their NEPA claims.
6  While a court must ordinarily address the question of standing first, in this case the question
7  of standing is inextricably intertwined with the merits and the Court's discussion above
8  demonstrates why plaintiffs have standing.

9  Article III standing requires "that the plaintiff show (1) an injury in fact that is both
10  (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
11  (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) a
12  likelihood that the injury will be redressed by a favorable decision." Ashley Creek
13  Phosphate Co., 420 F.3d at 937.

14  The government argues that plaintiffs have not shown injury in fact for two reasons.
15  First, it repeats its argument that economic interests do not fall "within NEPA's zone of
16  interests." Gov't Reply at 6 (quoting Ashley Creek Phosphate Co., 420 F.3d at 938, 940).
17  As the Court explained, supra, however, economic interests that are interrelated with natural
18  or physical environmental effects fall within NEPA's zone of interests. The alfalfa farmer
19  plaintiffs' potential economic injury arises directly from the environmental impact of
20  APHIS's decision to deregulate Roundup Ready alfalfa. In Ashley Creek, in contrast, the
21  plaintiffs' economic injury arose from increased competition, not from any environmental
22  impact. Id. at 940.

23  Second, the government complains that plaintiffs have not shown a sufficient
24  "geographic nexus" because they do not offer evidence that they farm near a genetically
25  engineered alfalfa crop. The deregulation decision was made only recently, however, and at
26  oral argument plaintiffs explained that the planting of the genetically engineered crop will
27  occur in the spring; thus, it is premature for plaintiffs to show such injury. Plaintiffs need not
28  wait until the genetically engineered alfalfa is planted near their alfalfa fields to bring suit, or

United States District Court
For the Northern District of California

1  until their fields are contaminated with genetically engineered seed mixed with non-

2  engineered seed. "[T]o require actual evidence of environmental harm, rather than an

3  increased risk based on a violation of the statute, misunderstands the nature of environmental

4  harm and would undermine the policy of the . . . Act." Central Delta Water Agency v.

5  United States, 306 F.3d 947, 948 (9th Cir. 2002). "[T]he possibility of future injury may be

6  sufficient to confer standing on plaintiffs; threatened injury constitutes 'injury in fact.'" Id. at

7  947. As is explained above, plaintiffs have established a "reasonable probability" that their

8  organic and conventional alfalfa crops will be infected with the engineered gene, especially

9  given the undisputed concentration of alfalfa seed farms. They have also established the

10  reasonable probability of the development of additional glyphosate resistant weeds. Such

11  threatened injury is sufficient to confer standing. The law does not require plaintiffs to meet

12  the impossible task of proving that their alfalfa farms have already been contaminated. See

13  Citizens for Better Forestry v. U.S. Dep't of Agriculture, 341 F.3d 961, 971-72 (9th Cir.

14  2003) ("Were we to agree . . . that a NEPA plaintiff's standing depends on 'proof' that the

15  challenged federal project will have particular environmental effects, we would in essence be

16  requiring that the plaintiff conduct the same environmental investigation that he seeks in his

17  suit to compel the agency to undertake.") (internal quotation marks and citation omitted).

18  Finally, at oral argument the Court asked the government who would have standing if,

19  as it asserts, even the organic and conventional alfalfa farmers do not. The government

20  responded that in its view no one has standing to challenge the deregulation decision in light

21  of APHIS's finding that the engineered gene is harmless. As the Court explained, supra,  it

22  does not agree with APHIS's cramped reading of what constitutes an environmental impact.

23  **II.  OTHER CLAIMS**

24  Since the Court has concluded that APHIS must prepare an EIS before approving the

25  petition to deregulate Roundup Ready alfalfa, it need not address plaintiffs' claims under the

26  ESA and PPA. The agency's decision may be different after it gathers the relevant data and

27  considers the public's comments on such data; accordingly, the Court will not now decide the

28  additional grounds for challenging the agency's decision. See Thomas v. Petersen, 753 F.2d

For the Northern District of California
United States District Court

18

1 754, 761 n.4 (9th Cir. 1985). Plaintiffs' ESA and PPA claims are therefore dismissed
2 without prejudice.

### CONCLUSION

4     NEPA "is our basic national charter for protection of the environment." 40 C.F.R.
5 § 1500.1(a). "NEPA emphasizes the importance of coherent and comprehensive up-front
6 environmental analysis to ensure informed decision making to the end that 'the agency will
7 not act on incomplete information, only to regret its decision after it is too late to correct.'"
8 Blue Mountains Biodiversity Project, 161 F.3d at 1216 (quoting Marsh v. Oregon Natural
9 Resources Council, 490 U.S. 360, 371 (1989)). "An EIS is required of an agency in order
10 that it explore, more thoroughly than an EA, the environmental consequences of a proposed
11 action whenever 'substantial questions are raised as to whether a project *may* cause
12 significant [environmental] degradation." Id. (internal quotation marks and citation
13 omitted).

14     "That is exactly the circumstances of this case." Id. Substantial questions are raised
15 as to whether (1) the deregulation of Roundup Ready alfalfa without any geographic
16 restrictions will lead to the transmission of the engineered gene to organic and conventional
17 alfalfa; (2) the possible extent of such transmission; and (3) farmers' ability to protect their
18 crops from acquiring the genetically engineered gene. Substantial questions are also raised
19 as to the extent to which Roundup Ready alfalfa will contribute to the development of
20 Roundup-resistant weeds, especially when considered in conjunction with the already
21 deregulated and soon-to-be deregulated Roundup Ready crops, and as to how farmers will
22 address such weeds. APHIS failed to answer these substantial questions, concluding instead
23 that any environmental impact is insignificant because gene transmission is the problem of
24 the organic and conventional farmers and weeds always develop resistance to herbicides. As
25 such reasons are not "convincing" and do not demonstrate that the agency took a "hard look"
26 at the potential environmental impacts of its deregulation decision, plaintiffs' motion for
27 summary judgment on its NEPA claim that APHIS is required to prepare an EIS is
28 GRANTED. Defendants' cross motion on the NEPA claim is DENIED, and the parties'

United States District Court
For the Northern District of California

19

1  cross-motions on the other claims are dismissed as moot in light of the Court's dismissal of

2  those claims without prejudice.

3        The parties shall meet and confer and submit a proposed Judgment to the Court on or

4  before February 26, 2007.

5        **IT IS SO ORDERED.**

6  Dated: Feb. 13, 2007

7                                                          /s/
                                              CHARLES R. BREYER
                                              UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28